UNITED STATES of America, Appellee,

v.

Robert WALDMAN and David E. Dick, Defendants, Appellants.

No. 77-1434.

United States Court of Appeals, First Circuit.

Argued April 3, 1978.

Decided June 16, 1978.

Manuel Katz, Boston, Mass., with whom Henry D. Katz, Boston, Mass., was on brief, for appellants.

Michael A. Collora, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

Defendants-appellants Waldman and Dick were convicted and sentenced on fifteen counts of securities fraud violating 15 U.S.C. § 77q(a) and 77x.[1] Each count alleged that defendants mailed a confirmation of purchase of a security, involving a

---

1. The court sentenced Waldman to five years concurrent on all counts and Dick to five years concurrent on ten counts and an additional five years concurrent on the five other counts but consecutive to the first five years.

different transaction on a different day.[2] The indictment, listing 58 counts, was returned on March 3, 1977. A magistrate conducted an arraignment hearing the next day during which he granted appellants' attorney permission to appear for purposes of arraignment only, with an option to withdraw from the case before the deadline for filing motions. That date was originally set for March 28. The magistrate granted an extension to April 25, but the trial judge moved the date back to April 15.

The magistrate held another hearing on April 11 at which the appellants' original attorney withdrew. On April 14 their trial attorney filed an appearance, and the court extended the time for filing motions until April 22. One of those motions was a motion to continue the trial, then scheduled to begin on June 6, until October 1. The court denied that motion, but did grant two shorter continuances before the trial ultimately got under way on July 6. At all relevant times one attorney was representing both appellants.

Appellants now argue (1) that they were not adequately warned of the dangers inherent in joint representation, thereby depriving them of their right to effective assistance of counsel; (2) that the district court abused its discretion by not granting requested continuances, thereby depriving them of their rights to effective assistance of counsel and to due process; and (3) that their motion to dismiss should have been granted because the counts of the indictment were multiplicious and duplicitous.

## I.

Since *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the law has been settled that the Sixth Amendment right to assistance of counsel is breached where one lawyer is required to represent two defendants despite the defendants' conflicting interests. *Id.* at 70, 62

S.Ct. 457. There is, however, a corollary principle. "Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel. This principle recognizes that in some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation." *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Thus, it is clear that defendants can waive their right to separate counsel.[3]

A criminal defendant's waiver of a constitutional right is a serious matter. The Sixth Amendment right to counsel is an important aspect of procedural fairness. "Courts bear a special responsibility to be careful in evaluating claims that defendants have waived important constitutional rights, even where those defendants are represented by counsel." *United States v. Christian,* 571 F.2d 64, 68–69 (1st Cir. 1978). *See Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In the past we have exercised our supervisory powers, directing trial judges as to their duty when one attorney speaks for two or more defendants.

In *United States v. Foster,* 469 F.2d 1 (1st Cir. 1972), we said:

> "[I]t shall be the duty of the trial court, as early in the litigation as practicable, to comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of such risks, and to inquire diligently whether they have discussed the risks with their attorney, and whether they understand that they may retain separate counsel appointed by the court and paid for by the government." *Id.* at 4.

---

**2.** Some victims were listed in more than one count for separate transactions.

**3.** In *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), counsel for defendants tried to get separate counsel for his clients, but the court had turned down his request.

This "duty of inquiry", *id.*, was discussed further in *United States v. Donahue,* 560 F.2d 1039 (1st Cir. 1977). There the magistrate told the defendants "that there is a possibility here, where one attorney represents the same parties and the same indictment, that there is always the possibility of conflict of interest." *Id.* at 1042. One of the defendants expressed some uncertainty "about how that mechanism of conflict of interest works." *Id.* at 1042. The magistrate gave no further explanation. We held that the magistrate had not satisfied his duty and gave several examples of dangers of joint representation about which he should have warned the defendants.[4] We concluded that "[w]ithout purporting to prescribe any particular form of words, we emphasize that under *Foster*, the court must explain and explore the risks of joint representation." *Id.* at 1043.

The magistrate's general warning at the March 4 arraignment included the elements required by *Foster*:

"When one counsel represents two parties in the same case, there is always a possibility of conflict of interest.

In other words, Mr. Waldman, he may find that in going through the trial, he may be able to save Mr. Dick but you [*sic*], and he may decide to sell you down the river, as it were—to use the vernacular. That makes it simple for you to understand."

Each appellant said that he understood the possibility and that he had discussed it with the attorney then of record. The magistrate went on to advise appellants that either "may obtain separate counsel if you wish, and that if you can't afford counsel, the Court will appoint counsel for you."[5]

The court did not advise the appellants of any of the specific dangers of joint representation suggested in *Donahue*. Nevertheless, we hold that appellants' waiver of separate counsel was adequate. In the first place, *Donahue* was decided September 6, 1977, almost two months after the conclusion of this trial. We do not require the court to predict cases elaborating duties imposed pursuant to our supervisory powers, and we do not think that any specifics of the form of a court's inquiry concerning a defendant's waiver of separate counsel would rise to the level of a constitutional right. Since we view *Donahue* as merely expanding a supervisory rule, we hold that it does not apply retroactively to this case. *Foster* was the relevant benchmark by which to judge this case.

Moreover, *Donahue* did not purport to prescribe any form of words. 560 F.2d at 1044. What it did require was a careful explanation of the dangers of joint representation when it becomes evident that a defendant does not understand the importance of a conflict of interest. In this case both appellants answered unequivocally that they did understand the problem, that they had discussed it with their attorney,[6] and that they preferred to have the same lawyer. Indeed, at the April 11 hearing the magistrate raised the issue again, asking "You mean you are going to have one lawyer representing both?" Mr. Dick said "We would prefer it", and Mr. Waldman said "Because it is the same case and the same facts, and we are father-in-law and son-in-law, and no one is going to turn on each other." It is clear that they recognized the problem, had considered it, and had reasons to support the decision they had arrived at.

**4.** "The court should have advised that it was possible with respect to particular defenses and particular decisions—such as whether or not to take the stand, or to call particular witnesses, or to ask particular questions on cross-examination—that what was in one defendant's best interest would turn out not to be in the other's." *United States v. Donahue,* 560 F.2d 1039, 1043–44 (1st Cir. 1977).

**5.** The magistrate suggested that the trial judge would repeat the *Foster* warning, but the record does not show that the trial judge ever did so.

**6.** "It is not enough . . . for the district court to rely on counsel", *Donahue, supra,* 560 F.2d at 1043; however, it is significant that appellants had already gotten expert advice and nonetheless opted for joint representation. We also consider it significant that both appellants are well educated and that Waldman is an attorney, although he had not practiced for many years.

In such a situation the court has no further duty under *Foster* or *Donahue*.

Though the above discussion disposes of this case, we think it appropriate to point out that the *Donahue* elaborations of the *Foster* rule are controlling law in this circuit. Rather than taking the risk that we will disagree with a trial court's conclusion that defendants understand the dangers of joint representation, courts should routinely give a fuller warning along the lines suggested in *Donahue*.

## II.

There is no substance to the claim that the trial court abused its discretion by refusing to grant continuances until October. "There are no mechanical tests for deciding when a denial of a continuance is an abuse of discretion. Each case must be evaluated on its own facts." *United States v. Poulack*, 556 F.2d 83, 86 (1st Cir. 1977); *see Rastrom v. Robbins*, 440 F.2d 1251, 1252–53 (1st Cir. 1971) (evaluating a claim that lack of time to prepare resulted in ineffective assistance of counsel). "It is axiomatic that the district court has inherent power to control its own docket to ensure that cases proceed before it in a timely and orderly fashion . . .. The power to grant or deny a continuance is a basic tool committed to the discretion of the trial court to effectuate this purpose." *United States v. Correia*, 531 F.2d 1095, 1098 (1st Cir. 1976) (citations omitted). Under the facts of this case we cannot say that the trial court abused its discretion.

Although there were originally 58 counts in the indictment and although the defense did not have notice of the fifteen that would be tried until the day of trial, the case was not inordinately complicated. All counts involved separate transactions that were part of only three distinct schemes which were themselves very similar. The trial lasted eight days, and the trial attorney had been on the case about three months before trial commenced.[7] The trial court granted two continuances totalling a month.[8] Finally, we are not given any specific reasons why the defense attorney could not adequately prepare in the time available. Appellants did mount a defense, calling witnesses and introducing exhibits. We are not told of any way in which this defense would have improved if the attorney had had more time.[9] To be sure there are limits on the court's discretion "imposed by the defendant's constitutional rights to assistance of counsel, to the testimony of witnesses on his behalf, or to a trial free of prejudicial publicity", *id.*, but appellants' brief fails to explain how any of these rights were abridged.

## III.

Appellants argue that their indictment was multiplicious because the 58 counts actually alleged only one scheme of securities fraud. They are charged under 15 U.S.C. § 77q(a) which reads:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

---

7. The delay in securing legal counsel is largely attributable to appellants, since they knew that a criminal investigation was underway at least by July 26, 1976, when they were subpoenaed to appear before a grand jury.

8. Whether or not the trial court was influenced by a mistaken belief that further continuances would be barred by the Speedy Trial Act is irrelevant, because the court was also influenced by the legitimate goal of bringing the case to trial at an early date, and the date it chose was within its discretion.

9. Appellants' only allusion to a time problem is the allegation that the court "deprived defendants of the time needed to seek from among the thousands of investors, interview and obtain witnesses who would have testified favorably for defendants . . .." We are not told why this project could not have at least begun during three months the attorney had been on the case. Nor are we told what favorable evidence the victims could possibly have had.

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

We agree with every other circuit that has faced the question that the appropriate units of prosecution under § 77q(a) are separate transactions accompanied by use of the mails.[10]  *United States v. Ashdown,* 509 F.2d 793, 800 (5th Cir.), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975); *United States v. Dioguardi,* 492 F.2d 70, 83 (2d Cir.), *cert. denied,* 419 U.S. 829, 873, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974); *United States v. Aldridge,* 484 F.2d 655, 660 (7th Cir. 1973), *cert. denied,* 415 U.S. 921, 922, 94 S.Ct. 1423, 39 L.Ed.2d 477 (1974); *Sanders v. United States,* 415 F.2d 621, 626 (5th Cir. 1969), *cert. denied,* 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970); *Palmer v. United States,* 229 F.2d 861, 867 (10th Cir. 1955), *cert. denied,* 350 U.S. 996, 76 S.Ct. 546, 100 L.Ed. 861 (1956) (suggesting that each separate use of the mails is a crime). In this case the counts alleged separate transactions.  Therefore the counts were not multiplicious, and each count could carry a separate sentence.

■ Finally, there is no merit to appellants' argument that each count is duplicitous.  Appellants' basis for this claim is that paragraphs 5, 7, and 8 of count one, incorporated into each subsequent count, somehow allege separate crimes, distinct from the § 77q(a) offense charged by the last paragraph of each count.  Paragraph 5, however, merely describes the scheme of which each offense was a part.  It does not charge a separate crime and the jury was so instructed.  Paragraphs 7 and 8 are lists of the material misstatements and omissions,

respectively.  They allege essential elements of the § 77q(a) offense, not separate offenses.

*Affirmed.*

---

10. The Second Circuit, in dictum, had suggested that the gist of the crime was a fraudulent scheme and that use of the mails was simply a jurisdictional prerequisite.  *United States v.*  *Cashin,* 281 F.2d 669, 673 (2d Cir. 1960).  *Contra United States v. Dioguardi,* 492 F.2d 70, 83 (2d Cir. 1974).