UNITED STATES of America, Appellee,

v.

**Lee McComas RAMSEY, Appellant.**

UNITED STATES of America, Appellee,

v.

**Cecil Zedrick RAMSEY, Appellant.**

UNITED STATES of America, Appellee,

v.

**Sharon WRAY, Appellant.**

**Nos. 79–5223 to 79–5225.**

United States Court of Appeals,
Fourth Circuit.

Argued April 7, 1981.

Decided Oct. 9, 1981.

Rehearing Denied Nov. 10, 1981.

---

Robert M. Ariail, Greenville, S. C. (Mitchell & Ariail, Greenville, S. C., on brief), O. W. Bannister, Greenville, S. C. (Hill, Wyatt & Bannister, Greenville, S. C., on brief), A. Hoyt Rowell, III, Charleston, S. C. (Gibbs, Gaillard, Rowell & Tanenbaum, Charleston, S. C., on brief), for appellants.

Eric William Ruschky, Asst. U. S. Atty., Columbia, S. C. (Thomas E. Lydon, Jr., U. S. Atty., Columbia, S. C., on brief), for appellee.

Before RUSSELL, HALL, and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

Lee McComas Ramsey, Cecil "Zed" Ramsey and Sharon Wray appeal their convictions, entered after a jury trial, on charges of conspiracy to import marijuana, conspiracy to distribute cocaine and distribution of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846, 963 and 18 U.S.C. § 2.

The principal allegations of error assigned by the appellants are (1) that they were denied their sixth amendment right to effective assistance of counsel by their representation at trial by a single attorney; (2) that the district court erred in allowing the introduction of evidence of another crime; (3) that the district court erred in not dismissing certain counts of the indictment as to all appellants; and (4) that the trial court erred in not granting appellant Wray's motion for a directed verdict as to the count alleging conspiracy to import marijuana. In addition, Lee Ramsey filed a *pro se* brief containing numerous other allegations of error.

We find no merit to the appellants' sixth amendment "effective assistance of counsel" argument as none of them objected at trial to their multiple representation by a single attorney, and they have failed to demonstrate that there was an actual conflict of interest in such representation, or that the trial judge at any stage of the proceeding should have known of a possible conflict of interest. Our review of the rec-

ord, briefs and oral argument further convinces us that there was more than adequate evidence to withstand Wray's motion for a directed verdict at the close of the government's case, and sufficient evidence to sustain the appellants' convictions, and that there is no merit to any of the appellants' other arguments urging reversal.

## I.

The offenses underlying this appeal involve a conspiracy to import marijuana and a related scheme to obtain funds, through the importation and distribution of cocaine, to facilitate the marijuana importation scheme. An understanding of the facts is complicated by the presence of two separate but interrelated conspiracies, two groups of defendants, and the relationship of one to the other. Lee Ramsey, his son Zed Ramsey and Sharon Wray, Zed's girlfriend, along with others, comprise one group; Ted Deary and Bill Chandler, the government's chief witnesses, are the principal members in the other group involved in the marijuana and cocaine schemes.

Lee Ramsey is a graduate of the United States Naval Academy. He retired after serving 30 years in the United States Navy, obtained degrees in law and engineering, was an experienced pilot, and engaged in real estate enterprises in Columbia, South Carolina and elsewhere. Zed Ramsey, Lee's son, was shown at trial to have been the principal narcotics entrepreneur of the Ramsey group, and was the link between the Chandler group and Lee Ramsey. Sharon Wray, the third appellant, lived with Zed Ramsey and was implicated as the courier of cocaine between Zed and the Chandler group. Lee Ramsey's wife and daughters, and friends with whom they lived, were involved in some of the travels resulting in the indictments and convictions in this case but either were not indicted or had indictments dismissed. Ted Deary, a rock concert promoter, and Bill Chandler are both admitted smugglers and dealers in marijuana and cocaine, were unindicted coconspirators in this case and presented the principal evidence against the three defendants.

Deary became involved with drugs in early 1977, met Chandler, and suggested to him that they import and distribute marijuana. Chandler had contacts in Jamaica to supply the marijuana, but neither he nor Deary had the facilities for importing it from Jamaica into the United States. After several unsuccessful attempts to locate transportation, Deary heard that Zed Ramsey (who lived in the same apartment complex as Deary and whom he had known casually) had means of transporting the marijuana. Deary approached Zed Ramsey, and Zed expressed an interest in transporting the marijuana from Jamaica. Deary and Zed then met Chandler at the latter's apartment and Zed agreed to furnish an unidentified pilot and seaplane to smuggle the marijuana into the United States. Zed also revealed that he had previously dealt in cocaine. The three men discussed the logistics of packaging, loading and transporting the marijuana from Jamaica to the United States and the division of the profits from the operation. Deary then went alone to the Columbia airport to inspect the seaplane, belonging to Lee Ramsey, which was to be used in the operation. Early the following month, January 1978, Chandler traveled to Jamaica and arranged for the delivery and packaging of the marijuana to conform with the dimensions of the seaplane's cargo hatch.

Belinda "Zoe" Ramsey, Lee's daughter, was staying with James Brooks in a rented house on Edisto Island near Columbia, South Carolina. In mid-January 1978, Deary, Chandler, Zed, Wray and Brooks inspected the island for a possible landing and unloading site for the seaplane, and Deary rented another house as part of the importation plan. Zed, Chandler and Deary initially planned to land the marijuana near Edisto Island on January 22, 1978, where it was to be unloaded and stored by Deary, Zed Ramsey and Brooks. The day before the planned operation, Zed Ramsey informed Deary that the seaplane had "instrument problems"; in reality, Lee's seaplane had crashed in Cuba a week earlier,

while he was returning from a Caribbean vacation that included a stop in Jamaica. After negotiating with Cuban officials for the repair and return of his seaplane, Lee Ramsey returned to the United States by commercial flight through Canada in late February 1978. Shortly thereafter, Chandler met Lee Ramsey for the first time at the latter's home where they discussed, along with Zed, but never in the presence of one another, the availability of aircraft generally and landing sites for a new plane to be purchased by Lee. Zed proposed that a new plane could be purchased with profits from the sale of cocaine, if some were available for sale. Chandler contacted Deary who indicated that he could sell cocaine, and made arrangements for the sale. On February 28 or March 1, 1978, Wray and another woman delivered one pound of cocaine, obtained from Zed, to Chandler at a supermarket parking lot in Columbia. On Chandler's orders, she delivered an additional pound of cocaine to him on a Columbia street corner after dark on March 2, 1978. Chandler, on March 15, sold 19.3 ounces of this cocaine to undercover government agents. Chandler and Deary subsequently were arrested on March 15 by South Carolina local authorities and charged in state court with conspiracy to distribute and distribution of cocaine. According to Chandler, both Zed and Lee Ramsey told him that the cocaine had been on Lee's seaplane when it crashed in Cuba but had been rescued and smuggled into the United States through Montreal by Lee Ramsey.

On March 11, prior to the second cocaine sale, Chandler and Lee Ramsey traveled to Jamaica to examine a possible landing site. They located a suitable site and Lee Ramsey returned to Columbia, South Carolina, while Chandler remained to arrange for additional marijuana to be packaged and delivered. During the trip they discussed the sale of cocaine. Lee denied Chandler's version of the trip, testifying he traveled to Jamaica with Chandler to look at real estate.

After Chandler's arrest on March 15, he continued his contact with Lee Ramsey, and they discussed the smuggling of both cocaine and marijuana. Chandler also became interested in a tract of land in South Carolina that Lee Ramsey was attempting to develop and assisted him in obtaining financing.

In late May 1978, Lee Ramsey purchased a Lockheed Lodestar airplane in Texas which, according to his testimony, was to be used to haul solar panels for a solar energy company of which he was a part owner.[1] The plane was flown to St. Petersburg, Florida, remaining there until June 13 when it was flown to Fort Lauderdale. The plane left Fort Lauderdale on July 5, returned to St. Petersburg on July 8 and remained there until August 30. According to Chandler, Lee Ramsey told him that during July he had flown to Jamaica, picked up a load of marijuana and delivered it to the United States. On August 30, Lee Ramsey and a co-pilot picked up the Lodestar in Florida and, after a landing in North Carolina, landed in Lexington County, South Carolina on August 31. An FAA-affiliated flight instructor, suspicious of the plane, followed it into the airport, and, after the co-pilot had run from the plane, obtained a search warrant in conjunction with local authorities. The search revealed toppings from a marijuana plant, and three bags of marijuana residue were gleaned from the carpet and interior of the plane. According to Chandler, in one of his final contacts with the Ramseys, he delivered $4,000 to Zed Ramsey at Lee Ramsey's home in November 1978 for use in buying cocaine or in getting the engine from Lee's seaplane out of Cuba.

Lee Ramsey, Zed Ramsey, and Sharon Wray were indicted for conspiracy to import marijuana, conspiracy to distribute cocaine and distribution of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846, 963 and 18 U.S.C. § 2. James Brooks was indicted for

---

1. There was evidence at trial that the Lodestar's prior owner was suspected of using the airplane for marijuana importation, and that it was the subject of nationwide surveillance by federal authorities.

conspiracy to import marijuana. The court directed a verdict in favor of Brooks at the close of the government's evidence. Lee Ramsey and Wray testified in their own behalf, but Zed did not take the stand. The jury found Lee and Zed Ramsey guilty on all counts and Sharon Wray guilty of conspiracy to import marijuana and two counts of cocaine distribution.

## II.

While the appellants' generalized allegations of error are patently without merit, their contention that they were denied effective assistance of counsel because all three were represented by one attorney requires more extended discussion.

On May 9, 1979, Lee Ramsey and Sharon Wray, along with Belinda Ramsey and James Brooks (defendants not parties to this appeal), made an initial appearance before United States Magistrate Gambrell in Columbia, South Carolina. Attorney Ronald Vaughn made a special appearance on Wray's behalf, while Lee Ramsey requested court-appointed counsel. The next day, Zed Ramsey appeared before the magistrate represented specially by Vaughn. At arraignments held on May 17, 1979, Lee Ramsey again appeared without counsel, and Vaughn, making a special appearance, represented Zed Ramsey and Wray.

Pursuant to instructions from the district court, Magistrate Gambrell held a status hearing on May 24. Attorneys Joseph Belser and Geoffrey Levy made special appearances for Zed Ramsey and Sharon Wray. The magistrate indicated that he would no longer permit special appearances on the defendants' behalf, and that he was "under instructions" to take the defendants into custody and then appoint counsel, if they did not retain counsel. He gave the de-

fendants until May 30 to retain counsel.[2] On June 1, Magistrate Gambrell entered an order tentatively qualifying Lee Ramsey as eligible to receive court-appointed counsel upon the payment of $2,500. On June 8, 1979, attorney Glenn Zell noted his appearance on behalf of all the appellants. When Zell informed the court on June 12 that, as he was from Atlanta, he would have to associate with local counsel, the court reluctantly granted Zell's motion to allow Lee Ramsey to serve as local counsel.[3] At trial, the defense advanced different grounds for acquittal for each of the appellants. It was the defendants' position that Zed Ramsey's conversations with Deary and Chandler were part of a hoax—that he never intended to participate either in a marijuana or cocaine scheme but only led them to believe he was interested in their smuggling activity in order to obtain their assistance in financing his real estate developments. Sharon Wray's defense was essentially a general denial of the allegations coupled with an argument based on the physical improbability of her committing the acts alleged. Lee Ramsey simply denied any involvement with illegal drug dealings.

## A.

The sixth amendment right to counsel includes the right to effective assistance free of conflicts of interest, and in the case of a single attorney representing multiple defendants, free from conflicting interests between each of the defendants. *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Hollaway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). This principle applies to retained counsel as well as to appointed counsel. *Cuyler, supra.*

---

2. At the status hearing, Lee Ramsey was the only defendant to request appointed counsel. Zed Ramsey volunteered to represent himself. The magistrate commented that he thought Zed Ramsey would be "handicapped" if he attempted self-representation, and that he could seek appointed counsel. Zed Ramsey indicated that the only thing holding up retention of counsel was the fact that "apparently [there is] a conflict of interest that [retained counsel] can only

represent one or the other." The magistrate then reiterated that he was "under instructions" that if the defendants did not retain counsel, he was to have them taken into custody and then appoint counsel.

3. Lee Ramsey's role as local counsel was *pro forma*, as he took no active role in the presentation of the appellants' case.

The Supreme Court in *Wood* remanded that case to the state trial court because of its failure to inquire, on the record, whether there was a conflict in the representation of three defendants by an attorney who was paid by the defendants' employer, when the employer had a competing interest in the outcome of the trial. The *Wood* Court held that the possibility of this particular conflict of interest was sufficiently apparent at the time of the defendants' probation revocation hearing that the trial court had a duty to inquire further into that possibility. There is, of course, always a possibility of conflict in any case where one attorney represents more than one defendant in the same trial, but the common thread running through the Court's decisions in *Wood, Cuyler,* and *Hollaway* is that it is not the mere possibility of any conflict of interest that requires a trial court to make a *sua sponte* inquiry, but the possibility of a particular conflict.

■ After *Wood,* there are two certain rules in this area of sixth amendment law— (1) if an actual conflict of interest is present, constitutional error has occurred, as prejudice is inherent in the conflict, and (2) where a defendant makes a timely objection to multiple representation, a trial court commits reversible error if it refuses to investigate whether a conflict exists.[4] The Court in *Cuyler,* however, instructed that in the absence of a specific objection, the trial court may assume that multiple representation presents no conflict, and that unless a trial court knows or reasonably should know that a particular conflict exists, it need not initiate an inquiry. At first blush, the Court might have appeared to change this position in *Wood,* as its holding required an inquiry when the record had disclosed that the possibility of a conflict was sufficiently apparent that the trial court should have been alerted as to its existence.[5] The Court, however, noted the following:

> Justice White's memorandum states that we have gone beyond the recent decision in *Cuyler v. Sullivan.* Yet nothing in that case rules out the raising of a conflict-of-interest problem that is apparent in the record. Moreover, Sullivan *mandates* a reversal when the trial court has failed to make an inquiry even though it "knows or reasonably should know that a particular conflict exists."

*Id.* at 272 n.18, 101 S.Ct. at 1104 n.18 (citations omitted). Thus *Wood* clarified this principle of sixth amendment law by applying *Cuyler* to a situation in which the

---

4. Prior to *Wood* and *Cuyler,* courts had fashioned a variety of rules regarding the amount of conflict that need be shown to impugn a criminal conviction, *compare United States ex rel. Hart v. Davenport,* 478 F.2d 203 (3d Cir. 1973) (some possible conflict) *with United States v. Atkinson,* 565 F.2d 1283 (4th Cir. 1977), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978) (actual conflict), and the scope of the trial court's duty to hold a *sua sponte* hearing to investigate potential conflicts. *Compare United States v. Waldman,* 579 F.2d 649 (1st Cir. 1978) *and United States v. Lawriw,* 568 F.2d 98 (8th Cir. 1977), *cert. denied,* 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 60 (1978) *with Foxworth v. Wainwright,* 516 F.2d 1072 (5th Cir. 1975). *See Cuyler v. Sullivan,* 446 U.S. 335 at 346 n. 10, 100 S.Ct. 1708 at 1717 n. 10, 64 L.Ed.2d 333. This court's decisions in *Sawyer v. Brough,* 358 F.2d 70 (4th Cir. 1966), *United States v. Truglio,* 493 F.2d 574 (4th Cir. 1977) and *Atkinson, supra* indicated a recognition that while an actual conflict inevitably results in prejudice to the defendant requiring reversal, the mere possibility of a con-

flict does not result in a sixth amendment violation.

5. Whenever there is joint representation, such a duty is now imposed on federal trial judges by Fed.R.Crim.P. 44(c), which provides:

Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

As this rule became effective December 1, 1980, it was not applicable to the trial in this case.

possibility of a specific conflict of interest was so strong as to require a *sua sponte* inquiry into its existence.

The issue here, therefore, is whether there was present in the defense of any of the appellants an actual conflict of interest on the part of the attorney because he represented other defendants at trial or, short of that, whether the possibility of a particular conflict was apparent at trial, requiring the trial judge to make a further inquiry into the existence of that conflict.

### B.

█ In essence, Sharon Wray's defense was predicated on a general denial of the charges, and a contention that it was physically improbable for her to have been present at the scene of the cocaine transactions at the times they allegedly occurred. She introduced evidence, in the nature of an alibi, that she was in Florida shortly before each alleged transaction. While it was possible that she could have traveled from Florida in time to make the deliveries, a jury could have inferred that it was improbable. Zed Ramsey, on the other hand, attempted to convince the jury that while he had conversations with Deary and Chandler about marijuana smuggling, these discussions were part of an elaborate hoax designed to cajole Chandler into financing a real estate development. He maintained that the whole plan was incapable of execution, as Lee's seaplane was unable to carry the anticipated cargo over the route planned. Lee Ramsey rested his case on an unequivocal denial of any involvement with illegal drugs. Viewing these theories from

the perspective of a completed trial, it is clear that there is nothing inherently inconsistent about them, and that a competent trial attorney could zealously and effectively present each of the theories to a jury. Zed's hoax defense did not conflict with the denials of Lee or Sharon Wray, nor were Lee's explanations of his contacts with Chandler at odds with the theories advanced by Zed or Sharon Wray. Finally, Lee's position was not impaired by the arguments on behalf of Zed or Sharon Wray, as neither of their contentions rests on any implied involvement of Lee in illegal activity. The appellants each allege at least one conflict involving an alleged lack of zealousness on Zell's part in seeking to disassociate each of them from portions of the government's case focusing on the other two. The record on appeal, however, does not support their contentions that these instances are evidence of actual conflicts of interest.

Counsel conducted a vigorous defense for each of the defendants, actively cross-examining government witnesses, devising a strategy for each of the defendants and pursuing it aggressively at trial. The possibility of conflicts of interest preventing an effective defense was discussed with all three appellants by the magistrate,[6] yet only Lee Ramsey requested separate appointed counsel, and subsequently declined that appointment. None of the appellants objected either before or during trial to their representation by a single attorney, and it is apparent that there were a number of possible advantages to representation by the same counsel.[7] For example, the joint

---

6. At the status hearing on May 24, the magistrate commented to Attorney Belser:

    THE COURT: I'd be less than honest with you if I didn't tell you that I don't think you're going to be able to represent both of these people [Zed and Wray]. Federal Judges sit on pins and needles when they see retained attorneys coming in representing two people in love charged with a conspiracy. You've got conflict built in to a situation like that. And the Court's got no duty to hold a member of the bar by the hand and seek to assure that he adheres to the canons of professional ethics; but the Court has a profound duty to protect the rights of the

defendants and to run the conduct of the trial. And when a Federal Judge senses that conflict surfaces during trial, it makes them very unhappy with lawyers.

7. As Justice Frankfurter said concurring and dissenting in *Glasser v. United States*, 315 U.S. 60, 92, 62 S.Ct. 457, 475, 86 L.Ed. 680 (1948), "[a] conspiracy trial presents complicated questions of strategy for defense. There are advantages and disadvantages in having separate counsel for each defendant or a single counsel for more than one.... A common defense often gives strength against a common attack."

representation allowed a single attorney, Zell, to formulate an internally consistent defense strategy by permitting his close contact with all members of this family unit. A further indication of the attorney's awareness of the particular interests of each defendant is the fact that, after careful consideration, he chose to have Lee Ramsey and Sharon Wray testify, but advised Zed Ramsey not to do so, as Zed's prior marijuana importation conviction would be of great value to the prosecution during cross-examination. Finally, we cannot disregard the fact that these defendants were not unfamiliar with the criminal justice system, as Zed previously had been through three criminal jury trials, and Lee was a member in good standing of the South Carolina Bar.

We conclude that the appellants have failed to show that an actual conflict of interest existed which would have denied them effective assistance of counsel, and that the record does not demonstrate that the district judge should have been aware of the possibility of some particular conflict during the proceedings below. Therefore, their convictions are affirmed.

*AFFIRMED.*