**AMARIN PLASTICS, INC.,**
Plaintiff, Appellee,

v.

**MARYLAND CUP CORPORATION**
d/b/a Sweetheart Products Group,
Defendant, Appellant.

No. 91–1250.

United States Court of Appeals,
First Circuit.

Heard July 29, 1991.

Decided Oct. 8, 1991.

Rehearing and Rehearing En Banc
Denied Nov. 14, 1991.

Joseph L. Cotter with whom Helene Kazanjian, Barbara Healy Smith, and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for defendant, appellant.

Charles Donelan with whom Ann L. Palmieri and Day, Berry & Howard, Boston, Mass., were on brief, for plaintiff, appellee.

Before TORRUELLA, Circuit Judge, HILL,* and BOWNES, Senior Circuit Judges.

HILL, Senior Circuit Judge.

Maryland Cup Corporation, doing business as Sweetheart Products Group ("Sweetheart"), appeals from a jury verdict awarding Amarin Plastics Inc. ("Amarin") damages for breach of contract.

The business relationship between the two parties began approximately 18 years ago. Sam Shapiro owned and operated Sweetheart, a company which was undertaking to sell plastic utensils—knives, forks, spoons, and the like. Richard King, an acquaintance of Shapiro, operated Amarin and was its engineer. In 1973, these two men and companies entered into a relationship in which Amarin would produce plastic utensils for Sweetheart. Sweetheart's sales grew dramatically, and both companies prospered greatly.

Not all of their contractual agreements were formalized to the extent that they might have been had this litigation been foreseen. The parties had worked together in an amicable, symbiotic relationship until Shapiro sold Sweetheart to another corporate entity. The new owners had had no prior dealings with King or Amarin. They elected to cease contracting the production of plastics to Amarin. This termination of the long personal relationship illuminated the lack of formal, detailed writings evidencing the contractual status of the two companies. It required this litigation through a jury trial to determine and define the rights and obligations of the parties.

To determine the present contractual relation of the two parties, the jury was asked to begin in 1973, when Amarin and Sweetheart entered a contract in which Amarin would make plastic cutlery for Sweetheart for a five year period. During this same time, the two parties also entered a Mold Removal Agreement (the "Agreement"). It is this agreement which is the subject of this lawsuit.

To make the plastic cutlery, Amarin used molds. These molds were produced for and owned by Sweetheart, but Amarin allegedly provided the design. The molds remained in the possession of Amarin. The Mold Removal Agreement stated that if Sweetheart ever removed these molds from Amarin's possession, Sweetheart would pay Amarin one-third of the molds' costs. At the time of the execution of this agreement, Amarin had nine molds in its possession. The parties disagree over whether the agreement covered subsequently manufactured molds. Amarin contends that the Agreement covers fifty-one molds, for the creation of which it provided the engineering services. Sweetheart argues that the Agreement covered only the nine molds in existence when the contract was made. The contract, by its terms, refers to the "mold charges quoted herein," implying

* Of the Eleventh Circuit, sitting by designation.

that the contract referred only to molds in existence at the time of the contract. However, the jury apparently found that the Agreement covered subsequent molds.

In addition to the dispute over whether the contract applied to any subsequent molds, the parties also disagreed over which subsequent molds, if any, the agreement covered. The written Agreement seemed to indicate Sweetheart would be required to pay the one-third charge only for molds *removed* from Amarin's possession. Sweetheart never physically removed thirteen of the molds from Amarin's possession. Moreover, Amarin never had possession of all fifty-one molds. The manufacturers of the molds shipped fifteen of them directly to Sweetheart. However, Amarin claims the agreement covers molds it never physically possessed.

King and industry experts testified at trial that it is industry practice to enter this type of mold removal agreement. The money charged in the agreement would reimburse Amarin for its costs in helping produce and maintain these molds. The agreement would also enable Amarin to recoup the costs of expanding its factory to meet Sweetheart's production demands. Amarin argued that the Agreement was not designed to pay Amarin for the molds, but to reimburse Amarin for its contribution to the engineering and production of the molds. In effect, then, the Agreement simply reimbursed Amarin for its services and would protect it if Sweetheart decided to stop doing business with Amarin. Therefore, it did not matter, Amarin argued, that Amarin never possessed fifteen molds or lost possession of thirteen. The terms of the agreement covered services, and the termination of the companies' relationship would trigger the terms of the Agreement.

In 1983, Shapiro sold Sweetheart to Fort Howard Paper Company. The new management decided to start manufacturing cutlery in-house and to end the relationship with Amarin. This decision caused Amarin to invoke the terms of the Agreement and to demand one-third of the molds' costs. The jury was then asked to decide whether a contract existed and whether

this contract covered all fifty-one molds. The jury awarded Amarin $760,026.09, which was one-third of the cost of the fifty-one molds.

Sweetheart appeals this judgment and raises four issues. One, whether there was error in the trial court's denial of Sweetheart's motion for judgment notwithstanding the verdict or a new trial. Two, whether evidence concerning Amarin's engineering services should have been admitted. Three, whether the trial court should have granted continuances until two witnesses were able to attend trial. Four, whether two documents were inadmissible hearsay.

## JUDGMENT NOTWITHSTANDING THE VERDICT

Sweetheart contends that there was not enough evidence for the jury to find that the Agreement covered the fifty-one molds, and the district court erred in not granting its motion for judgment notwithstanding the verdict or a new trial. The appellant has a high burden to show that a jury verdict should be disturbed. In *Chedd–Angier Production v. Omni Publications Int'l, Inc.*, this Court wrote

Appellate review of a jury verdict is extremely restricted and should be granted cautiously and sparingly. To do otherwise deprives the party of a decision by jury. We are compelled, therefore, even in a close case, to uphold the verdict unless the facts and inferences, when viewed in the light most favorable to the party for whom the jury held, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have arrived at this conclusion. 756 F.2d 930, 934 (1st Cir.1985). The Court should draw all inferences in the plaintiff's favor. *Payton v. Abbott Labs*, 780 F.2d 147, 156, 19 Fed.R.Evid.Serv. 1077 (1st Cir.1985). If the evidence is contradictory, and reasonable people could disagree about the outcome, then the issue should be decided by the jury.

*Chedd–Angier*, 756 F.2d at 934.

After a review of the evidence, we hold that the matter was properly presented to the jury. Both Shapiro and King gave

evidence that the Mold Removal Agreement, as orally modified, was designed to reimburse Amarin for its engineering services in production and maintenance of the molds.

In a letter, Shapiro noted that the written agreement was extended beyond 1978 by oral modifications. Shapiro believed that the new agreement covered new molds that replaced the worn molds.[1] Amarin did not demand payment for the old molds, but had a continuing right to do so if Sweetheart stopped doing business with Amarin.

Shapiro and King also modified the Agreement to cover molds that were not sent to Amarin. When King learned that Banner Mold and Die Co., Inc., the mold manufacturer, was sending molds directly to Sweetheart, he voiced his concern to Shapiro that Amarin was being by-passed. King testified that he and Shapiro agreed that the written agreement would cover these molds as well, and that King should continue to provide engineering services for molds sent directly to Sweetheart. This oral agreement modified the original agreement covering only molds in Amarin's possession.

Amarin also presented evidence about the purpose of the contract. King testified that the Mold Removal Agreement was designed to reimburse him for providing engineering services for the design of the molds. Shapiro, in his letter, agreed that the one-third figure in the agreement covered King's engineering assistance. Shapiro also wrote that the Agreement was designed to allay King's concerns that Sweetheart might produce the cutlery in-house. The agreement would help Amarin recoup the costs of expanding its factory and buying equipment to meet Sweetheart's needs if the relationship ever ended.

■ King, Shapiro, and employees of Amarin, Banner, and Tupperware International testified that King performed engineering services as required by the agree-

ment. Sweetheart argues that King's contributions were minimal and merely replicated the current state of the art. Amarin never contested this. In fact, King himself testified that he provided state of the art engineering to the design and manufacture of the molds and that these services were not unique. Sweetheart's argument regarding the quality of King's services is irrelevant since the agreement merely required engineering services, not unique and novel engineering advances.

This evidence was sufficient for the jury to find that there was an agreement covering engineering services, that Amarin had performed, and that Sweetheart's duty to perform had matured.

Sweetheart also moved for a new trial. A new trial should be granted only if the verdict is against the clear weight of the evidence or "resulted from some trial error and amounts to a clear miscarriage of justice." *Payton,* 780 F.2d at 152. While Sweetheart contests the admission of some evidence and the district court's denial of its motions for continuance, we do not find that the district court erred. *See infra.* Moreover, although the evidence was contradictory, and the facts were hotly disputed, we conclude that the verdict was supported by substantial evidence and do not conclude that an injustice was done.

## EVIDENTIARY RULINGS

■ Sweetheart next contends that the district court mistakenly introduced evidence of Amarin's engineering services since these services are irrelevant to the Mold Removal Agreement. King, Haldie Nicholson, an employee of Amarin, and Ralph P. DeFelice, an employee of Banner, all testified as to the nature of Amarin's services. To be admissible at trial, evidence must be relevant, tending to prove a "fact that is of consequence to the determination of the action." Fed.R.Evid. 401, 402. *See Cruz–Sanchez v. Rivera–Cordero,* 835 F.2d 947, 949, 24 Fed.R.Evid.Serv.

---

1. Sweetheart argues that since Shapiro did not draft the agreement, he does not have personal knowledge to testify about the agreement. However, Shapiro signed the agreement and certainly was competent to testify as to its inter-

pretation once the district court found that the contract was ambiguous. Moreover, Shapiro was competent to testify to subsequent oral modifications.

493 (1st Cir.1987). We find that this was relevant evidence.

Amarin was suing on a contract. Since the matter of consequence was the nature and scope of the contract, any evidence that would help prove a contract would be relevant. In its complaint and at trial, Amarin argued that the Agreement covered engineering services provided by King. Amarin did not introduce evidence of the cost of these services, but merely demonstrated to the jury how King and Amarin helped design the molds. While this evidence could not have been used to prove the existence of a claim, since Amarin was not suing in *quantum meruit,* the evidence was relevant to show the jury what the contract encompassed and how the contract was performed. This would help make the contract more understandable to the jury.

█ Moreover, proof of performance is an essential part of a contract claim. To show that it is entitled to recovery, the plaintiff must show that it has performed. *See Mirachnick v. Kaplan,* 294 Mass. 208, 1 N.E.2d 40 (1936) (to survive a motion for demurrer, a mortgagor must allege performance in an action for breach of contract); *Gagnon v. Ainsworth,* 283 Mass. 488, 186 N.E. 498, 499 (1933) (plaintiff must prove complete performance to recover on a building contract). By showing that it had provided engineering services, Amarin demonstrated that it had fulfilled its part of the contract, thereby giving rise to Sweetheart's duty to pay one-third of the costs when Sweetheart terminated the relationship.

## CONTINUANCES

█ Sweetheart next contends that the district court erred in not granting a continuance until one of its witnesses became well enough to testify. In determining whether there was error in a denial of a continuance, the court should evaluate the facts of the particular case and not mechanically apply a test. *United States v. Lussier,* 929 F.2d 25, 28 (1st Cir.1991); *United States v. Poulack,* 556 F.2d 83, 86, 2 Fed.R.Evid.Serv. 54 (1st Cir.1977), *cert.*

*denied,* 434 U.S. 986, 98 S.Ct. 613, 54 L.Ed.2d 480 (1977). The district court is accorded broad discretion to grant or deny continuances, and only an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" will abuse it. *United States v. Torres,* 793 F.2d 436, 440 (1st Cir.1986), *cert. denied,* 479 U.S. 889, 107 S.Ct. 287, 93 L.Ed.2d 262 (1986), *quoted in U.S. v. Lussier,* 929 F.2d at 28.

The court may look at prior delays and their reasons, the hardship to the nonmovant, and the good faith of the movant. *Lussier,* 929 F.2d at 28; *United States v. Waldman,* 579 F.2d 649, 653 (1st Cir.1978).

The conduct of the moving party is a factor to be considered. In *Lussier,* the defendant moved for a continuance on the grounds that he had not had enough time to digest government documents. 929 F.2d at 28. This Court upheld the district court's denial of that motion, noting that the problem was partly the defendant's own fault, for he had had enough time to prepare, and the issues involved were not complex. *Id.*

In *Waldman,* the district court denied the defendant's motion for a continuance, even though the defendant did not have notice of 15 counts of the indictment until the morning of trial. This Court affirmed, holding that the district court was in a better position to weigh the facts of the case. 579 F.2d at 653.

On November 19, 1990, Sweetheart moved for a continuance because one of its employees, Walter Dow, had been hospitalized. Dow would have testified that Amarin's engineering support was not novel and merely mirrored the current art of the industry. Dow would have also testified that some of the molds by-passed Amarin and were sent directly to Sweetheart. Sweetheart contends that this testimony would have rebutted Amarin's claim that King provided engineering services as provided by their oral agreements.

The district court did not abuse its discretion. Dow's testimony would have duplicated other witness's testimony and would

have covered uncontroverted matters. Other witnesses were present at trial to testify to the same facts that Dow would have. In addition, Dow's proposed testimony was never controverted at trial. Amarin acknowledged that the engineering designs provided by King were not unique and that many of the molds were shipped directly to Sweetheart from Banner. King, Amarin's chief witness, supported these assertions in his direct testimony. Furthermore, Dow was not going to testify about the chief issues in the case—whether a contract existed and whether it had been performed.

The parties had approximately fourteen months of discovery in this case. Although the district court granted several extensions of discovery, Sweetheart never deposed Dow to preserve his testimony. Whether this was a trial strategy or an oversight, we cannot say, but there was nothing in the record to guide the district court in determining how Dow's testimony would have been material to Sweetheart's case.

■ Sweetheart next contends that it was error for the trial judge to deny its motion for a continuance until Shapiro returned from Florida. The trial court did not abuse its discretion.

Sweetheart served a subpoena on Shapiro requiring his appearance at trial. After attempting to contact Sweetheart's attorneys, Shapiro called Ann L. Palmieri, an

attorney for Amarin. Shapiro informed Palmieri that he had high blood pressure and that the last time he testified in federal court, he had had a heart attack and had to have heart surgery. His doctors had warned him against placing himself in circumstances that might raise his blood pressure and increase the risk of a heart attack. Since he was afraid that testifying at trial would be precarious for his health, he requested Palmieri to file a motion to quash the subpoena on his behalf. After a doctor certified that Shapiro was in poor health and that testifying at trial might endanger it, the district court granted the motion to quash on November 6, 1990, on the condition that Shapiro submit to a videotaped deposition in Florida.[2] Shapiro was wintering in Florida on the advice of his doctors.

Despite being given an opportunity to depose Shapiro, Sweetheart did not avail itself.[3] Instead, Sweetheart moved for a continuance until Shapiro's expected return to Massachusetts the following spring. The district court denied this motion, apparently for the same reasons it granted the motion to quash.

There is some disagreement about the reasons for the motion to quash. Sweetheart contends that the motion to quash was based on Shapiro's physical inability to travel from Florida. This was contradicted, Sweetheart argues, by Shapiro's return to Boston for the Thanksgiving holiday. If Sweetheart's contentions were true, then perhaps the trial court might have granted

---

**2.** The trial court's power to quash a subpoena because of the witness's ill health is well established. *See In re Battaglia,* 653 F.2d 419, 420 (9th Cir.1981) (defendant moved to quash grand jury subpoena because of health risk); *United States v. Haldeman,* 559 F.2d 31, 81, 181 U.S.App.D.C. 254, 1 Fed.R.Evid.Serv. 1203 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), *and reh'g denied,* 433 U.S. 916, 97 S.Ct. 2992, 53 L.Ed.2d 1103 (1977) (President Nixon moved to quash subpoena because of poor health); *Trebby v. Goodyear Tire & Rubber Co.,* 129 F.R.D. 468, 16 Fed.R.Serv.3d 971 (S.D.N.Y.1990) (trial court grants motion to quash notice of deposition since witness was hospitalized with serious heart condition).

**3.** Sweetheart argues that it was not given an opportunity to save Shapiro's testimony because

the court had the previous year denied its motion to reopen discovery for the purpose of deposing Shapiro. Discovery had been open for approximately fourteen months (from November 1, 1987, until January 1, 1989), after the trial court had granted the parties numerous extensions. During that period, Amarin had deposed Shapiro, and Sweetheart had an opportunity to cross-examine Shapiro at that time. On November 3, 1989, and on January 10, 1990, Sweetheart moved to reopen discovery to depose Shapiro. Since the parties had had ample time for discovery, and since Shapiro had already been deposed, the trial court denied the motion.

It did not become apparent until November 6, 1990, that Shapiro would be unable to attend trial. At that time, the district court appropriately ordered Shapiro to make himself available for a deposition. Sweetheart chose not to depose Shapiro.

a continuance until Shapiro's return. The record shows, however, that the motion to quash was granted because testifying at trial would be dangerous to Shapiro's health, not because travelling from Florida would be dangerous to his health.

Since the district court had granted the motion to quash because Shapiro was too ill to testify at trial, the motion for a continuance essentially asked the trial court to reconsider the issue. There was no indication that Shapiro's health would ever improve sufficiently for him to testify at trial; thus, the trial court did not abuse its discretion in denying the redundant motion for a continuance.

### HEARSAY

█ At trial, the court admitted Shapiro's deposition pursuant to Fed.R.Civ.P. 32(a)(3). Under this rule, exhibits to a deposition may be admitted at trial if admissible under the rules of evidence. In effect, the trial court applies the rules of evidence as if the witness were testifying at trial. Sweetheart objects to the admission of two letters—one that Shapiro wrote himself, and another that a lawyer prepared and Shapiro signed—on hearsay grounds. Shapiro's letters gave evidence that the Mold Removal Agreement covered all fifty-one molds. Sweetheart is correct in that the letters are out-of-court statements and were offered to prove the truth of their contents, but we conclude that the testimony given, including the letters, was not hearsay.

When a witness, on the stand and under oath, acknowledges that a prior statement is his own statement and is truthful, then the witness adopts the prior statement as his present testimony and there is no hearsay problem. Fed.R.Evid. 801 advisory committee's note (d)(1).[4] In *Bell v. City of Milwaukee*, the Seventh Circuit held that once the witness affirmed, as his own, statements made in the complaint, "the prior statements therefore became part of his oath-supported, court-given testimony subject to cross-examination and are not hearsay." 746 F.2d 1205, 1274, 16 Fed.R.Evid. Serv. 279 (7th Cir.1984). *See also United States v. Davis*, 487 F.2d 112, 123 (5th Cir.1973), *reh'g denied*, 486 F.2d 1403 (5th Cir.1973), *and cert. denied*, 415 U.S. 981, 94 S.Ct. 1573, 39 L.Ed.2d 878 (1974), *and reh'g denied*, 416 U.S. 975, 94 S.Ct. 2005, 40 L.Ed.2d 565 (1974) (if the witness asserts as true the contents of a prior statement, the witness in effect adopts the prior statement as his present testimony); 4 Weinstein's Evidence ¶ 801(d)(1)(A)[02] (an adopted prior statement becomes present testimony); *United States v. Klein*, 488 F.2d 481, 483 (2d Cir.1973), *cert. denied*, 419 U.S. 1091, 95 S.Ct. 683, 42 L.Ed.2d 684 (1974) (the adopted statement becomes substantive evidence); *Harman v. United States*, 199 F.2d 34, 36 (4th Cir.1952) ("when the witness testified that the statement was true it became a part of his testimony, and not a mere matter of impeachment"). *Contra United States v. Check*, 582 F.2d 668, 680, 3 Fed.R.Evid. Serv. 685 (2d Cir.1978) (the admission of prior consistent statements is error unless offered to rebut a charge of fabrication or improper motive).

At the deposition, Shapiro testified that the letters were his own statements and that the letters were true. The letters then became his present testimony and are not hearsay.[5]

---

**4.** *Prior statement by witness.* Considerable controversy has attended the question whether a prior out-of-court statement by a person now available for cross-examination concerning it, under oath and in the presence of the trier of fact, should be classified as hearsay. If the witness admits on the stand that he made the statement and that it was true, he adopts the statement and there is no hearsay problem.

**5.** We make the following observation out of an abundance of caution that our ruling today does not constitute precedent for the taking of the sort of testimony discussed here over any and all objections. The testimony may have been objectionable on two grounds other than hearsay.

First, Amarin's counsel asked Shapiro, "Is this letter true?" Such a question put to a witness with the writing tendered to him is obviously leading. Second, Sweetheart might have objected urging that use of the letters was impermissible bolstering. A prior consistent statement may be used only to rebut a charge of "recent fabrication or improper influence or motive." Fed.R.Evid. 801(d)(1)(B). *See United States v. Piva*, 870 F.2d 753, 758, 27 Fed.R.Evid.Serv.

154

The judgment of the district court is *Affirmed.*

1101 (1st Cir.1989) (government was allowed to introduce a prior consistent statement to rehabilitate a witness's credibility after showing defendant had implied an improper influence). We are not directed to anything in the record indicating that Sweetheart charged Shapiro with recent fabrication or an improper motive during the deposition; thus, bolstering would not appear permissible. However, these two objections were never made, and we will not pass on them now.