UNITED STATES of America, Appellee,

v.

Joseph P. FAHEY,
Defendant, Appellant.

No. 84–1620.

United States Court of Appeals,
First Circuit.

Argued May 10, 1985.
Decided July 30, 1985.

William A. Brown, Boston, Mass., with whom Brown & Prince, Boston, Mass., was on brief, for defendant, appellant.

Peter A. Mullin, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BOWNES, Circuit Judge, VAN DUSEN,* Senior Circuit Judge, and BREYER, Circuit Judge.

BOWNES, Circuit Judge.

Joseph P. Fahey appeals his conviction on fourteen counts of mail and wire fraud in connection with sales and promotional efforts by the Fahey Company (company) in the precious metals market between July and November of 1982. Fahey contends on appeal that (1) he received ineffective assistance of counsel due to his lawyer's conflict of interest; (2) evidence discovered as a result of investigative efforts at a mine site were fruits of an illegal search and seizure and should have been suppressed; (3) the district court erred in admitting certain statements made by a codefendant under the coconspirator hearsay exemption and violated his rights under the confrontation clause; (4) evidence of a television program concerning the company's sales and mining activities was so prejudicial that it denied him a fair trial; and (5) the district court erred in refusing to strike alleged surplusage from the indictment. We affirm.

---

* Of the Third Circuit, sitting by designation.

## I. BACKGROUND

In 1978 Joseph Fahey founded Certified Commodities of New England (CCNE), an investment company in Waltham, Massachusetts, concentrating in commodity futures. In November of 1981, CCNE began selling an investment package known as "Special Project 501," a commodity pool in which investor's funds were used to purchase the marketing rights to the silver from a Nevada mine known as the "Ingalls Mine." CCNE planned to purchase the silver below spot price and sell it at or above spot price, with CCNE and the investors splitting the profits.[1] The manager of the Ingalls Mine, however, misappropriated money given to him by CCNE to finance the mining. Rather than telling his clients that their investment had not panned out, Fahey developed a plan to raise new capital and delay the expected date of delivery. The plan involved: becoming a joint venturer in the Ingalls Mine in order to exert greater control over operations; changing the concept of the 501 program from an investment plan to a commodity sales program in which customers would purchase gold and silver outright;[2] and moving to Boston under the name, "The Fahey Company." With the birth of the Fahey Company in late spring of 1982, CCNE ceased to exist.

Investors in CCNE's Special Project 501 were contacted by Fahey and encouraged to "roll over" their CCNE securities into Fahey Company commodities. The company "guaranteed" investors in Special Project 501 deliveries of gold or silver within a thirty-month period at prices that were comparable or better than those offered them in the previous investment pooling arrangement. It also mounted a high pressure selling campaign to procure new buyers who would supply the capital necessary to support the company, develop and operate the company's mining property, pay off the Special Project 501 investors, and mine and process the gold and silver that new buyers were purchasing at "producer" cost.

The Ingalls Mine was never operated. Instead, in July of 1982 the company entered into a joint venture agreement with three other individuals who owned a claim on a tract of land called the "Penny Mine" in Nevada. The three Nevada venturers had been trying to mine their property during the previous year but had run out of money. To try and interest new investors they had enlisted Wilfred Kerr, a mining engineer whose expertise was coal mining, not gold mining, to prepare a report on the ore content in the Penny Mine claim and two adjoining tracts in which Kerr and the others held an interest. The "Kerr report," a two-page handwritten document, had not been prepared for the Fahey Company and was based in large part on adjoining claims in which the company did not have an interest. Nonetheless, the company incorporated the statistics in the Kerr report into its sales literature and phone presentations to assure potential customers that sufficient gold and silver would be extracted from the mine to meet the company's guaranteed delivery promise.[3]

In the course of its selling campaign, the company made a number of exaggerations, misleading statements, and omissions in its sales literature and phone presentations. It stated that the company was a retail

1. Investors in Special Project 501 were told that they could not be guaranteed a profit but that their money would be handled in a professional and disciplined manner.

2. By selling gold and silver outright rather than offering securities investments, the Fahey Company did not have to comply with the disclosure requirements of either the federal Securities Exchange Acts or the Commodities Futures Trading Commission. Of course, by selling gold and silver Fahey had to guarantee delivery of all metal purchased.

3. Subsequently, the Fahey Company did engage disinterested professional ore experts to do a risk assessment of the Penny Mine. The company, however, did not pursue the assessments to the degree recommended to make an informed decision about whether to mine. The die had already been cast; the Fahey Company had promised in its literature and phone presentations that it guaranteed delivery of gold and silver in ten months and, thus, it could not afford to abandon the project.

wholesale broker of precious metals and typically sold gold and silver at spot price plus commission although it had never bought metal wholesale. Its literature portrayed the company as having "extensive experience with the precious metals mining areas of the west." In fact, its only previous experience was the Special 501 project. The sales literature stated that from "time to time" the company entered into joint ventures in mines to expand production or operate a mine and needed an infusion of capital to accomplish this. The company also stated that before it entered into a joint venture to mine a property, the property had to pass a "stringent criteria of evaluation established by independent engineering firms hired by the Fahey Company." The promotional material also stated that the company utilized a professional cost analysis to determine the profitability of a property. In actuality, the evaluation criteria had been written by a sales consultant for promotional purposes and no professional cost analysis was ever undertaken. According to the literature, the company presold approximately 5–10% of the ore likely to be produced in a mine at producer's cost in order to raise the capital needed to begin production. But, in fact, the company did not know what its production costs would be and did not in any way limit its offering to the number of investors needed to start up a mine. Although the sales presentation stated that all the money raised from investors would be used to "get the mine into production," more than half of the money raised was used to cover operating costs of the company headquarters and sales commissions. The company also represented that it had at least three properties from which it could obtain the necessary metal to meet its commitments: the Ingalls Mine, the Penny Mine, and a property called the "Pleasant Valley Mine" in South Dakota. In fact, the only efforts of the company to do any mining were undertaken at the Penny Mine.

The operation at the Penny Mine did not have an auspicious start. Bill Matovich, one of the coventurers and previous owners, had been hired to operate the Penny Mine. After several months, it became evident that Matovich was unqualified and incompetent. No ore had been processed. In October of 1982 Fahey hired a new manager with previous experience in the field and brought in some new equipment to try and get the mine into operation.

The Pleasant Valley Mine, one of the three mines frequently mentioned by company salesmen, was never mined for the benefit of company customers because the joint venture agreement that Fahey was negotiating with a subsidiary of AMG Energies fell through. Nonetheless, the selling continued.

Sometime in October of 1982 the FBI launched an investigation of the company's business practices and a well-known local television news reporter began an inquiry. Both the television crew and the FBI visited the Penny Mine site and the FBI took some samples for testing.

On November 15, 1982, the FBI executed a search warrant for the Fahey Company offices in Boston and seized a substantial number of business records. That same day the Massachusetts State Securities Division served Fahey and the company with a cease and desist order which prohibited further sales and froze the company bank account.[4] Needless to say, virtually all production work stopped after the cease and desist order. The first delivery of precious metals, which had been promised for May of 1983, never took place.

Shortly after the cease and desist order Fahey and four other key company employees were indicted on charges of mail and wire fraud and a conspiracy to defraud via the mail and wires. All of the defendants except Fahey were acquitted of all charges. Fahey was acquitted on the conspiracy counts.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

■ Fahey contends that he received ineffective assistance of counsel because

---

**4.** The cease and desist order was based on the state's belief that the Fahey customers' "purchases" of gold and silver were actually security transactions, not purchases of commodities.

his defense counsel, Richard Passalacqua, did not call as a witness Gerald Pearlstein, Fahey's business lawyer during the period of the alleged fraud. Fahey contends that defense counsel's failure to call Pearlstein was due to a conflict of interest; prior to the commencement of the trial, Passalacqua and Pearlstein had been partners in the same law firm. The record reveals that Fahey was aware of the previous association between the two lawyers and informed the district court on the record that, despite the possible conflict of interest, he wanted to retain Passalacqua. Fahey now contends that he would not have done so had he known Passalacqua would not call Pearlstein as a witness.

On appeal, Fahey urges us to overrule prior precedent and hold that the presence of a potential conflict of interest is a *per se* violation of a defendant's sixth amendment right to the effective assistance of counsel. Neither the Supreme Court nor any circuit court has adopted this inflexible position and, for a variety of reasons, we also decline to do so.

Since *Glasser v. United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942), the law has been settled that the sixth amendment right to effective assistance of counsel is breached where one lawyer is required to represent two defendants with competing interests. However, the Court also recognized that joint representation may be appropriate and advantageous in some situations and ruled that joint representation is not a *per se* violation of constitutional guarantees. *See also Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980) ("some showing of possible conflict is insufficient to impugn a criminal conviction").[5] In this case, the conflict issue does not arise from an obligation of "joint" loyalty where there

is a possibility that unforeseen conflicting evidence may surface at any point during a trial, but from a "dual" loyalty, *i.e.*, Fahey's defense counsel had a duty of loyalty to a defendant whose interests could have been adverse to one with whom counsel was formerly associated. Situations involving dual loyalty or dual representation are less likely to present unforeseen conflict problems because there are not two defenses unfolding simultaneously. In *Miller v. United States*, 564 F.2d 103, 106 (1st Cir.1977), *cert. denied*, 435 U.S. 931, 98 S.Ct. 1504, 55 L.Ed.2d 528 (1978), this court examined an alleged dual representation conflict and stated,

> Only a relatively slight showing of actual prejudice is required in joint representation cases, where an attorney is particularly susceptible to disabling conflicts .... But in a "dual" representation case, such as the present, a real conflict must be shown to establish the deprivation of effective assistance of counsel.

Consequently, we decline to adopt the rule that potential conflicts in "dual representation" cases are a *per se* violation of a defendant's sixth amendment right.

■ Although a potential conflict does not constitute a sixth amendment violation *per se*, a criminal defendant's waiver of a potential conflict is a serious matter. To insure that a defendant's rights are protected, we have instructed district courts

> as early in the litigation as practicable, to comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of such risks, and to inquire diligently whether they have discussed the risks with their attorney and whether they understand that they may retain [alternate counsel or have one] ... appointed by the court....

---

**5.** Recently, in *United States v. Cronic*, 466 U.S. 648, ___, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984), the Supreme Court defined effective counsel as "a reasonably competent attorney whose advice is within the range of competence demanded of attorneys in criminal cases," and reaffirmed its position that "we presume that the lawyer is competent to provide the guiding

hand that the defendant needs ... [unless the case is] one in which the surrounding circumstances make it unlikely that the defendant could have received effective assistance of counsel." *See also Strickland v. Washington*, 466 U.S. 668, ___, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

*United States v. Foster,* 469 F.2d 1, 4 (1st Cir.1972). *See also United States v. Waldman,* 579 F.2d 649, 651 (1st Cir.1978); *United States v. Donahue,* 560 F.2d 1039 (1st Cir.1977). In *Donahue* and *Waldman,* this court directed that trial courts be sure that defendants understand the potential ramifications of their waiving a conflict of interest before accepting the waiver. *Waldman,* 579 F.2d at 653; *Donahue,* 560 F.2d at 1043.

As its first on-the-record action in this case, the court conducted an extensive examination regarding Fahey's waiver of his conflict of interest claim. The court asked questions to determine whether Fahey had the requisite education, experience, and mental acuity to determine whether Passalacqua's representation would be in his best interest. Then the court read Fahey a letter written from the prosecuting attorney to Passalacqua expressing concern that his representation of defendant could present a conflict of interest problem because of Passalacqua's former association with a lawyer that rendered financial and business advice to the Joseph P. Fahey Company. The letter specifically highlighted the prosecutor's fear that a claim might be made that defense counsel would be reluctant to call Pearlstein as a witness, the very claim that is being brought. After reading the letter, the district court explained that potential conflicts of interest could arise between former partners where one is defending a claim related to a matter in which another allegedly rendered financial advice. Fahey stated that he understood the issue but that he was satisfied that his counsel would serve his best interests and that he had no fear that his counsel's fidelity would be compromised.

On appeal, Fahey now claims that he could not assess the risk associated with defense counsel not calling Pearlstein as a witness, *i.e.,* could not have made a knowing and intelligent waiver because he did not know what Pearlstein had said or what documents Pearlstein had produced before the grand jury; the grand jury transcript was not available until several days after the hearing on the conflict of interest issue.

We find this argument to be utterly specious. Fahey knew that Pearlstein had been subpoenaed to appear before the grand jury but waived his objection before the grand jury transcript was available, and after the transcript became available, he did not attempt to retract his waiver. But most importantly, we cannot see how Pearlstein's grand jury testimony could affect Fahey's decision to retain a former partner at Pearlstein's firm. Fahey contends that the information provided by Pearlstein to the grand jury supported an "advice of counsel/good faith" defense. But Fahey obviously knew the extent to which he had relied on Pearlstein's consultation and legal advice prior to Pearlstein testifying about it to the grand jury and was, therefore, in as good a position to judge the risk of not calling Pearlstein as a witness before receiving the grand jury testimony as after.

■ Although we find that Fahey executed a knowing and intelligent waiver of Passalacqua's potential conflict of interest, a waiver doesn't foreclose the possibility that an actual conflict could adversely have affected the adequacy of representation and violated Fahey's sixth amendment right to counsel. However, "[when] a defendant has voluntarily chosen to proceed with [a potential conflict] . . . it is fair, if he later alleges ineffective assistance growing out of a conflict, to require that he demonstrate that a conflict of interest actually affected the adequacy of representation." *Cuyler v. Sullivan,* 446 U.S. at 335, 100 S.Ct. at 1708 (Brennan, J., concurring) (addressing possible conflict because of joint representation). The conflict must be real, not some attenuated hypothesis having little consequence to the adequacy of representation. *Brien v. United States,* 695 F.2d 10, 15 (1st Cir.1982); *United States v. Martorano,* 620 F.2d 912, 916 (1st Cir.) (in banc), *cert. denied,* 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980). If the defendant demonstrates that an actual conflict of interest affected the adequacy of representation he need not demonstrate prejudice. *Strickland v. Washington,* 466 U.S. 668,

104 S.Ct. 2068; *Flanagan v. United States*, 465 U.S. 259, ___, 104 S.Ct. 1051, 1056, 79 L.Ed.2d 288 (1984); *Cuyler v. Sullivan*, 446 U.S. at 349–50, 100 S.Ct. at 1718–1719.

■ In order to establish an actual conflict the petitioner must show two elements. First, he must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. *Brien v. United States*, 695 F.2d at 15.

■ Fahey contends that defense counsel's previous association with Pearlstein prevented him from calling Pearlstein as a witness and presenting an effective defense based on good faith reliance on advice of counsel. Upon careful examination, however, the course that Fahey suggests his attorney should have pursued appears to be merely a hypothetical one that in reality would not likely have benefited Fahey and was, in fact, contrary to his best interests.

Although Passalacqua did not call Pearlstein as a witness, he did present evidence through cross-examination of former company employees that the Fahey Company and Fahey consulted with legal counsel in connection with the sales literature, and an instruction on "good faith reliance on the advice of counsel" defense was given to the jury. Had defense counsel called Pearlstein it likely would have weakened rather than strengthened Fahey's good faith reliance defense. The prosecution would have had the opportunity to cross-examine Pearlstein on the sales literature in excruciating detail to determine whether he had approved each untrue statement or had been given information to support the truth of each statement. Based on Pearlstein's testimony to the grand jury,[6] and the other evidence in the case, it seems clear that Pearlstein did not approve the misleading statements contained in the sales literature and was not given the complete documentation for what he did approve. Finally, we note that two of Fahey's codefendants who were also present at the meetings in which Fahey alleges he consulted with Pearlstein and relied on legal advice did not choose to call Pearlstein.[7]

Consequently, we do not find that Fahey's defense counsel's failure to call Pearlstein constituted ineffective assistance of counsel or a violation of Fahey's sixth amendment rights.

## III. SEARCH AND SEIZURE AT PENNY MINE SITE

■ Pursuant to an investigation of the Fahey Company in October of 1982, FBI Agent Broce and a fellow agent visited the Penny Mine site and talked with the mine superintendent. The superintendent gave the agents permission to look around and, in fact, drove one of the agents around in his pickup truck. On November 4, 1982, the FBI returned to the mine site with a district geologist from the Bureau of Land Management, U.S. Department of Interior. Again, the same mine superintendent gave them a tour and explained the operation to them. In May 1983, six months after Fahey had been indicted and the Fahey Com-

---

**6.** The grand jury testimony reveals that Pearlstein testified that he had been retained by Fahey and the Fahey Company to render business advice. Pearlstein stated that he was consulted about sections of the joint venture agreement on the Penny Mine site, but did not believe he had drafted the document. He stated he had no part in preparing the Pleasant Valley joint agreement.

**7.** The decision not to call Pearlstein appears to almost certainly have been an intentional strategic move since the reasonableness of Fahey's alleged reliance on Pearlstein would have been undermined by the government's presentation of a taped telephone conversation between Pearlstein and an FBI agent posing as an investor in which Pearlstein offers to structure a "loan" for the investor to allow the investor to invest funds after the state cease and desist order prevented "sales" of Fahey metals.

pany ceased operations, a Bureau of Land Management engineer spent four days on the Penny Mine claim doing field examinations and collected twelve fifty-pound samples from various excavation pits on the inactive mine site. Fahey claims that each of the three entries constituted an illegal search and that the soil taken for sampling was an illegal seizure under the fourth amendment.

Whether a defendant's fourth amendment rights have been violated depends upon "whether governmental officials violated any legitimate expectation of privacy held by [the defendant]." *Rawlings v. Kentucky,* 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980). The test for a legitimate expectation of privacy under the fourth amendment is (1) whether the individual has shown a subjective expectation of privacy and (2) whether that expectation is one society is prepared to recognize as reasonable. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

██ In examining Fahey's subjective expectation and the reasonableness of it, it is important to understand the status of his company's interest in the Penny Mine. The Penny Mine, located on the edge of Death Valley, was composed of four unpatented placer mining claims, each consisting of approximately forty acres of open desert. Legal title in land on which unpatented mining claims are located is held by the United States. *Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *Cameron v. United States,* 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659 (1920). The Fahey Company, the holder of the unpatented mining claims, has a nonexclusive possessory interest in the land for the purpose of mining. *Best,* 371 U.S. at 335, 83 S.Ct. at 381; *Cameron,* 252 U.S. at 464, 40 S.Ct. at 413. The United States retains the right to manage and dispose of the other resources on the land, *see* 30 U.S.C. § 612(b) (1982), and the general public has the right to enter on land containing unpatented mining claims for recreational and other purposes so long as they do not interfere with mining activities. *United States v. Curtis Nevada Mines, Inc.,* 611 F.2d 1277, 1286 (9th Cir.1980). In order to obtain fee title or a "patented" claim, the claimant must establish in an administrative hearing before the Bureau of Land Management that the land contains "a valuable mineral deposit ... which a prudent man would be justified in developing." *Curtis Nevada Mines,* 611 F.2d at 1281.

Fahey apparently objects to the first two visits because Agent Broce made observations regarding the lack of mining activity that was going on at the Penny Mine site which were part of the basis for obtaining the warrant to search the Fahey offices in Boston. The district court found that Fahey had no reasonable expectation of privacy from observation of an open mine in the middle of the desert. We agree. An operator of an unpatented mining claim is entitled to nonexclusive access to his mining operations. 43 C.F.R. § 3802.4–2 (1984). Since any member of the public is free to picnic on the claim, sleep on it, or watch tumbleweeds blow across it, we do not see how Fahey can claim he had a reasonable expectation to be free from a policial eye. Moreover, Broce testified that the superintendent of the mine asserted no expectation of privacy, but rather affirmed Broce's right to look around. Therefore, we uphold the district court's finding that the FBI did not violate the fourth amendment when it inspected the Penny Mine claim and observed the activity or lack thereof.

██ The May 1983 taking of soil samples requires a second look since members of the public are not permitted to intentionally carry material off public lands even though they may observe without restriction. The district court found that, even if the Fahey Company believed that the content of its soil was a matter of private concern, it had no legitimate expectation to remain free from warrantless intrusion under the open fields doctrine as expressed in *United States v. Oliver,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). Fahey contends that the *Oliver* open fields exception

should not apply because the gold content in the ore could not be observed in the open field but had to be taken to a lab for testing. This is a distinction without a difference. In *Oliver*, the Supreme Court examined the intent of the framers of the Constitution and concluded that fourth amendment protections for persons, houses, papers, and effects from unreasonable searches and seizures do not encompass open fields because "[o]pen fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops that occur in open fields." *Oliver*, 466 U.S. ____, 104 S.Ct. 1741. We do not believe that Fahey has offered any reasonable distinction, nor can we find one, between the growing of crops and the separating of minerals from the surface of land. We are further persuaded that Fahey had no privacy right that would prevent the government from seizing a soil sample in a manner that did not interfere with any mining activities because the government has the right to move or remove soil in managing or harvesting vegetation; the right to mine other resources on the land; and the authority to determine whether an operator qualifies for a patented claim, which obviously requires the testing of soil for its ore content. Therefore, we find no merit in Fahey's fourth amendment claims.

## IV. STATEMENTS OF COCONSPIRATOR

■ Fahey claims that statements made by alleged coconspirator/codefendant Richard B. Thompson and recounted at the trial by FBI Agent Broce were inadmissible hearsay and violated his constitutional right of confrontation. The challenged statement was made to Agent Broce during his investigation of the Penny Mines. Broce testified that Thompson, a Fahey Company consultant, said "[the] company had been titilated by the Kerr report, but they had not placed much reliance on it." The statement was admitted against Fahey on the basis of the coconspirator exemption to the Federal Rules of Evidence as a "statement by a coconspirator or a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E).

We first note that Fahey's attorney did not object at trial to the admission of Broce's testimony. The objection was raised by counsel for two other defendants and when the district court asked Fahey's counsel at the bench and again before charging the jury if he had anything to add, Fahey's attorney did not respond. The district court saved the objections of two of the defendants but did not note an objection on Fahey's behalf. However, as this case involves multiple defendants whose attorneys were routinely consolidating objections in the interest of time, we cannot be sure that Fahey's counsel's silence constituted a waiver of objection and therefore deal with the merits.

Fahey claims that Thompson's statement should not have been admitted against him because it did not meet the "in furtherance of" requirement of the coconspirator exemption and because its admission through Agent Broce abridged his sixth amendment right to be confronted with the witnesses against him. We deal with each argument in turn.

Federal Rule of Evidence 801(d)(2)(E) provides: "A statement is not hearsay if [t]he statement is offered against a party and is a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." The "in furtherance" requirement tracks the conventional agency rule from which the coconspirator exemption is drawn. The Advisory Committee's retention of the "in furtherance" requirement was motivated by a desire to strike a balance between the need for conspirators' statements in order to combat undesirable criminal activity which is inherently secretive, and the need to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence. *Weinstein's Evidence* ¶ 801(D)(2)(E)[01]. *See also Krulewitch v. United States*, 336

U.S. 440, 443–44, 69 S.Ct. 716, 718–719, 93 L.Ed. 790 (1949). Because of the in furtherance limitation on the admissibility of coconspirator's statement, a damaging statement is not admissible under 801(D)(2)(E) unless it tends to advance the objects of the conspiracy as opposed to thwarting its purpose.

■ Fahey claims that Thompson's statement about the company not relying on Kerr's report could not have been made "in furtherance of the conspiracy" because it is antithetical to the government's theory that the company encouraged buyers to enlist in the Fahey program by relying on Kerr's dubious estimates in its sales reports. At trial the district court explicitly asked the government how it believed Thompson's statement could have been made in furtherance of the conspiracy. The government contended at trial, as it does on appeal, that the remark, knowingly made to an FBI agent was intended to induce the agent into believing that the Penny Mine project had been more carefully explored than it had and thus mislead the FBI agent into believing that there was no fraud or misinformation involved in the selling of the Penny Mine gold. If, as the government contends, the statement was a lie fabricated to convince the agent that the project should be allowed to continue, then it was made to further the object of the conspiracy. Defendants' counsel argued, both at the time of the admission of the evidence and at the time of the giving of the jury instructions that the statements were not "false exculpatory statements" made in furtherance of the conspiracy but were honest representations of what Thompson believed to be true at the time. Defendants argue that because there was no opportunity to cross-examine Thompson about what he meant when he made the remark it should not have been admitted. While we find the defendants' argument to be plausible, the district court had the advantage of listening to all the evidence and we will not overturn his determination that the statement was made in furtherance of the conspiracy unless it was clearly erroneous. *See United States v. Patterson,* 644

F.2d 890, 894 (1st Cir.1981). Based on the other evidence offered regarding Thompson's knowledge and participation in the Fahey Company's affairs, we find the judge's determination was not clearly erroneous.

■ Fahey also contends that his inability to cross-examine Thompson about his statement to the FBI abridges his sixth amendment rights in a way prohibited by the Supreme Court in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In that case, the Court held that a confession by a codefendant implicating Bruton was inadmissible because it violated Bruton's right of cross-examination under the confrontation clause. In *Bruton,* however, the Court was careful to point out that it was not taking a position as to testimony admitted pursuant to a recognized hearsay exception: "There is not before us any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions raise questions under the Confrontation Clause." *Bruton,* 391 U.S. at 128 n. 3, 88 S.Ct. at 1623 n. 3. Two years later, in *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), a plurality of the Court found that a statement admissible under a state coconspirator rule did not violate the confrontation clause but stated, while

> [i]t seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots [,] ... this Court has never equated the two, and we decline to do so now. We confine ourselves, instead, to deciding the case before us.

*Id.* at 86, 91 S.Ct. at 218.

Following the lead taken in *Dutton,* the clear majority of courts deciding cases after *Dutton* recognize that, although *Bruton* does not apply where a statement falls within the coconspirator exception, possible confrontation clause infirmities may nonetheless present themselves in individual cases and that reliability of coconspirator's statements must be examined on a case-by-

case basis. *See, e.g., United States v. Perez,* 658 F.2d 654, 660–62 (9th Cir.1981) (mere satisfaction of the coconspirator exception requirements does not automatically meet all possible confrontation clause infirmities); *United States v. Nelson,* 603 F.2d 42, 46 (8th Cir.1978) (statements satisfying coconspirator rule do not violate defendant's confrontation right absent unusual circumstances; focus must be on whether indicia of reliability are present); *United States v. Wright,* 588 F.2d 31, 38 (2d Cir.1978), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979) (*Dutton* requires a case-by-case examination to determine whether the defendant's right of confrontation has been abridged); *United States v. Weiner,* 578 F.2d 757 (9th Cir.), *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978) (admission of statements under coconspirator exception does not equate to automatic compliance with confrontation clause requirements).

More recent Supreme Court authority in the area of out-of-court statements made by an unavailable witness reinforces this approach: "When a hearsay declarant is not present for cross-examination at trial, the confrontation clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.'" *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980).

The next step, therefore, is to determine whether Thompson's statement had the requisite "indicia of reliability." This brings us back to *Dutton v. Evans.* In *Dutton,* the Court noted that the testimony did not involve the use or misuse of a confession, was not made in a coercive atmosphere, was not crucial to the government's case, and was buttressed by other facts on the same matter. 400 U.S. at 87–88, 91 S.Ct. at 219. Similarly, here, Thompson's statement was not made in a coercive atmosphere and was not a major portion of the government's case. Thompson's statement was only a very small portion of Agent Broce's testimony which was primarily concerned with the accounting records at the corporate headquarters.

Broce's entire testimony consumed, at most, one-half of one of the eleven days the government took for its case-in-chief. Thompson's statement whether made in good faith or as a false exculpatory statement did not add any information that was not already present via the sales literature, salesman's manual and the employee witnesses. Most importantly, Thompson's out-of-court statement could not have been a critical or even significant factor in Fahey's conviction since Fahey was acquitted of the conspiracy charge and Thompson was acquitted of all charges. Therefore, we find that admission of Thompson's out-of-court statement did not violate the confrontation clause.

## V. THE TELEVISION NEWS PROGRAM

■ In order to show the central role played by Thompson in the operations of the company, the district court allowed the government to introduce evidence that an investigative reporter from a local television station visited the Fahey Company and spoke with Thompson. The court also admitted evidence that the program subsequently produced and aired was critical of the company and that immediately after the broadcast, the company amended its "fact sheets" used by salesmen to sell commodities. The purpose of this evidence was to support an inference that Fahey knew the sales presentations contained misrepresentations. Fahey alleges that references to the show were irrelevant and unfairly prejudicial because they tended to encourage the jury to make judgments based on the fact that a television station thought the conduct of the Fahey Company suspicious enough to warrant investigation and television reporting on its activities.

In examining the admissibility of evidence related to the news program we review the district court's determination only for abuse of discretion. *See United States v. Jarabek,* 726 F.2d 889, 903 (1st Cir.1984); *United States v. DeVincent,* 546 F.2d 452 (1st Cir.1976), *cert. denied,* 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977). Evi-

dence is relevant if it has any tendency to make the existence of any fact that is of consequence to determination of the action more probable or less probable than it would be without the evidence. Fed.R. Evid. 401. The indictment charged that Joseph Fahey "knowingly and wilfully devised and intended to devise a scheme to defraud...." The government introduced evidence to show that Fahey employees watched and recorded the television program on the company and that immediately following the broadcast the company made a number of changes in its sales presentations without making any changes in the operation of the company or its mining procedures. We think the evidence was relevant for the purpose of showing knowledge of previous misrepresentations.

Although relevant, evidence that is unfairly prejudicial is excludable under Federal Rule of Evidence 403, but the standard is a high one; its probative value must be *"substantially outweighed* by the danger of unfair prejudice...." Fed.R.Evid. 403 (emphasis added). In *United States v. Zeuli,* 725 F.2d 813, 817 (1st Cir.1984), we held: "Undue prejudice would seem to require exclusion only in those instances where the trial judge believes there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence."

The district court, in a pretrial hearing on the prejudicial impact of the news program asked the government whether it intended to introduce the content of the program, and the government stated it would not. The judge then directed the government to refer to the program as a news program rather than an investigative television report. During trial the only reference to the content of the show was a Fahey salesman's testimony that his salesmanager felt the show "was not too favorable." There was also testimony that salesmen watching the show said that they were surprised that there was a mine out there (in Nevada). This evidence may have been prejudicial in the sense that it was damaging to the defense, but it was not unfairly prejudicial since the observations were made by Fahey personnel.

Fahey's objection, however, is broader; it is directed towards all references to the fact that the show was filmed and aired as well as its critical posture. While we concede that there might be an instance where evidence that conduct by a defendant induced a television investigative program would be unfairly prejudicial, we find the evidence admitted here about the television show to be far less damaging than other cases where an appeals court has reversed a trial court on Rule 403 grounds. *See United States v. Biswell,* 700 F.2d 1310 (10th Cir.1983) (interjection of defendant's supposed gambling habits and past conviction of receiving stolen property in case alleging unauthorized use of food stamps was unduly prejudicial); *United States v. Koger,* 646 F.2d 1194 (7th Cir.1981) (evidence regarding conviction and jail term of party from whom defendant had received stolen checks should have been excluded as prejudicial where defendant did not know of third party's conviction or incarceration); *United States v. McManaman,* 606 F.2d 919 (10th Cir.1979) (statements obtained by use of secret interrogation concerning alleged planned murders should not have been admitted in trial on drug charges); *United States v. Back,* 588 F.2d 1283 (9th Cir.1979) (extraneous offense admitted with limiting instruction that jury may consider it for "what value it may have in just establishing whole pattern of the evening" violated Rule 403).

Based on our reading of the record, we cannot fault the district court's finding that the evidence was not unfairly prejudicial.

## VI. SURPLUSAGE

Finally, Fahey contends that alleged "surplusage" in the indictment was inflammatory and prejudicial, thereby denying him a fair trial. Federal Rule of Criminal Procedure 7(d) provides that a defendant may move that surplusage be striken from the indictment. The purpose is to "protect ... the defendant against

immaterial or irrelevant allegations in an indictment, ... which may ... be prejudicial." Fed.R.Crim.P. 7(d), advisory committee note. Fahey takes objection to the words "numerous" and "among other things"; the fact that the word "guarantee" was underlined in the indictment; and the use of the word "investors" to describe the company's customers. He contends that the words and emphasis inflamed the jury into believing that the crime alleged in the indictment exceeded the evidence presented at trial and that the surplusage allowed the prosecution to impermissibly enlarge the charges contained in the indictment.

We review the district court's ruling for abuse of discretion, *United States v. Forzese*, 756 F.2d 217 (1st Cir.1985); *United States v. Poore*, 594 F.2d 39, 41 (4th Cir.1979), and find the claim to be meritless. The district court heard argument on defendant's motion to strike the alleged surplusage and reserved his ruling until after all the evidence had been submitted. At that time, the court struck one of the overt acts listed in the indictment on which no evidence had been offered.

After reviewing the indictment as submitted to the jury, we agree with the district court that the word "numerous" and the phrase "among other things" were not used in a prejudicial or misleading fashion. The indictment states that the sales program contained "numerous" false and fraudulent representations and material omissions, but then goes on to enumerate fifty-three examples of misrepresentations and omissions and seven false sales techniques that were alleged to have been repeatedly made to Fahey customers. "Among other things" occurs in the introductory paragraphs detailing the alleged omitted or misrepresented facts. Given the length, complexity, and detail with which the Fahey Company and its employee's activities are described in the thirty-one page indictment, we do not feel that the government's use of this phrase was prejudicial or misleading. The jury's acquittal of four of the five defendants

charged in the indictment confirms our judgment.

Nor do we find that the reference to Fahey's customers as "investors" denied Fahey a fair trial. While he correctly asserts that the indictment charges mail and wire fraud and not securities violations, the nature of the Fahey program and its customer's "purchase rights" are clearly described in the indictment. Moreover, the witnesses, including a former salesman from the Fahey Company, used "investors" and "customer" interchangeably at trial and sales material generated by the company referred to the program as an "offering."

We need not tary long over the defendant's objection to the government's underscoring of the word "guarantee" when referring to promises made in the sales program. The Fahey Company chose to place the word in italics throughout its sales literature and italics is typically indicated by underscoring on a typewriter.

*Affirmed.*