DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant Marlon Terry, along with his co-defendant Rico Sims, was convicted of Kidnapping, Aggravated Burglary, and Aggravated Robbery, violations of Sections 2905.01(A)(3), 2911.11(A), and2911.01(A)(1) of the Ohio Revised Code. Mr. Terry and Mr. Sims were tried together before a jury and were represented by appointed lawyers from the same office. The primary issue before this Court is whether, once the prosecutor brought the joint representation to the trial court's attention, that court had a duty to conduct a hearing to determine whether there was an actual conflict of interest. This Court affirms Mr. Terry's convictions because the only circumstance of which the trial court would have *Page 2 
been aware suggesting a potential conflict was the joint representation, which was not sufficient to require a hearing, and because no actual conflict is apparent from the record.
 I. A. {¶ 2} Mr. Terry and Mr. Sims were accused of entering the apartment of Dorothy Williams on December 1, 2005, and demanding money from her. Ms. Williams and the defendants were neighbors, and she had known them before this incident. She identified them to the police and at trial.
 {¶ 3} Ms. Williams testified that she was in her bedroom at about 10:30 or 11:00 p.m. when Mr. Terry came in demanding money. He pushed her down on the bed and started stabbing at her with a steak knife. According to her, "sometimes he would miss me, sometimes he would get me." She testified that, as a result of the attack, she received "little puncture wounds" on her legs. He then chased her into the living room, where he continued to demand money. He repeatedly stabbed the sofa and told her that, if she did not give him money, she was going to be next. He told her he was going to "kill [her] ass."
 {¶ 4} While Mr. Terry and Ms. Williams were in the living room, Mr. Sims, at Mr. Terry's direction, went into Ms. Williams's bedroom and searched for money. Ms. Williams also testified that, at some point during the incident, Mr. Sims placed a telephone call from her apartment. Eventually Mr. Terry and Mr. *Page 3 
Sims gave up on finding any money and left the apartment, taking Ms. Williams's telephones with them. They instructed her not to call anybody, not to say anything, and not to do anything. Ms. Williams crawled to a neighbor's apartment "so [defendants] couldn't see [her] through the windows." The neighbor telephoned the police, and, at 2:00 or 2:30 a.m. the following morning, Mr. Terry and Mr. Sims were arrested at the apartment Mr. Sims shared with his mother.
 {¶ 5} Among the witnesses who testified for the State was Brittany Armstead, a friend of Mr. Sims. She testified that, during December 2005, she and Mr. Sims talked on the telephone "off and on." She identified the number to which a telephone call had been placed from Ms. Williams's apartment at 10:30 p.m. on December 1, 2005, as the number of her cellular telephone.
 {¶ 6} Mr. Sims called his mother as an alibi witness. She testified that she had arrived home between 10:30 and 10:45 p.m. on the night of the alleged robbery to find Mr. Sims, Mr. Terry, and a third man in her apartment watching a University of Akron football game on television. She said that neither she nor any of the three men left the apartment again that evening. She testified that she went to bed at about 1:30 a.m., and was awakened by police "banging on the door" at sometime between 2:00 and 3:00 a.m.
 {¶ 7} Mr. Terry testified in his own defense. He said that he had arrived at the Simses' apartment between 6:30 and 6:45 p.m. on the evening of December 1, 2005, because he and Mr. Sims were going to watch the University of Akron play *Page 4 
in the MAC championship football game. He said that he spent the entire evening at the Simses' apartment and that neither he nor Mr. Sims had left, except that Mr. Sims had gone out somewhere "for maybe a minute or two." He denied that he had entered Ms. Williams's apartment at any time that night.
 B. {¶ 8} At the beginning of defendants' trial, the prosecutor asked the court to place on the record that defendants waived any conflict inherent in their joint representation. Mr. Sims's lawyer stated that Mr. Sims waived any potential conflict inherent in the joint representation. The court then addressed Mr. Sims, who also said that he waived "any potential conflict of interest or appearance of a conflict of interest." Next, the court addressed Mr. Terry's lawyer, who assured the court that he had discussed the matter of the potential conflict with Mr. Terry, stated that he did not believe an actual conflict had arisen, and asked the court to inquire of his client regarding waiver. The court then addressed Mr. Terry:
 THE COURT: Mr. Terry, again, I am going to ask you the same question.
 There may or may not be an appearance of a conflict of interest or a genuine conflict of interest, although the Court does not believe the latter.
 But in any event, do you waive any alleged or appearance or the possible conflict of interest, if any there may be by the fact that co-counsel is Thomas Bauer, who is in the same office as your attorney, Attorney Bruce Conrad?
 DEFENDANT TERRY: Yes, ma'am. *Page 5 
The court than asked the defendants whether they had been promised anything in return for their waivers or whether they had been coerced or forced into making them. They both assured the court that they had not been, and the court accepted their waivers:
 THE COURT: All right. The Court will recognize that that knowing or that there is a knowing, intelligent, voluntary waiver of any conflict of interest.
 {¶ 9} Shortly after accepting the defendants' waivers, the court asked the prosecutor whether there had been any offers to either of the defendants to resolve the charges against them. The prosecutor explained that some alternative offers had been made to the defendants, including an offer to Mr. Terry to take a polygraph. The court asked the defendants' lawyers whether they had discussed the prosecutor's offers with their clients, and they told the court that they had and that their clients had rejected the offers. Mr. Terry's lawyer added that the offer for Mr. Terry to take a polygraph had been contingent on Mr. Sims pleading guilty and, since that had not happened, Mr. Terry had not responded to that offer.
 II. {¶ 10} Mr. Terry's sole assignment of error is that the trial court incorrectly failed to fully inquire into whether a conflict of interest existed, depriving him of his right to effective assistance of counsel. Mr. Sims separately appealed to this Court and also argued that the trial court had incorrectly failed to fully inquire into whether a conflict of interest had existed. His conviction was affirmed by a *Page 6 
different panel of this Court on February 21, 2007. State v.Sims, Summit App. No. 23232, 2007-Ohio-700.
 III. {¶ 11} If a defendant objects to joint representation, a trial court's failure to fully inquire regarding whether there is an actual conflict of interest deprives the defendant of his right to assistance of counsel and will lead to reversal of his conviction. Holloway v. Arkansas,435 U.S. 475, 484 (1978). In this case, Mr. Terry did not object to the joint representation. Neither did the prosecutor object to the defendants' joint representation. Rather, she simply brought the joint representation to the trial court's attention and asked that the defendants' waiver of any potential conflict be placed on the record.
 {¶ 12} If the possibility of a conflict of interest is "sufficiently apparent," a duty to inquire further is imposed on a trial court, even in the absence of an objection from any of the parties. Wood v.Georgia, 450 U.S. 261, 272 (1981). Once that duty arises, however, the failure of a trial court to further inquire into a possible conflict does not lead to a reversal of a defendant's conviction. Rather, it results in a remand to the trial court for that court to conduct a hearing to determine whether there was an actual conflict of interest.Id. at 273-274. It is important to recognize that the possible conflict that led to remand in Wood was not the fact that the three petitioners in that case had been represented by the same lawyer. Rather, it was the fact that that lawyer had been paid by the petitioners' *Page 7 
employer and it appeared as though certain strategic decisions might have been made for the purpose of furthering the interests of the employer rather than in the best interests of the petitioners.
 {¶ 13} In Holloway, the United States Supreme Court recognized that there may be advantages to joint representation:
 Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not per se violative of constitutional guarantees of effective assistance of counsel. This principle recognizes that in some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation. In Mr. Justice Frankfurter's view: "Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack."
435 U.S. at 482-483 (quoting Glasser v. United States, 315 U.S. 60, 92
(1942) (Frankfurter, J., dissenting). Because of that, and because a defense lawyer has an obligation to avoid conflicts and bring them to a trial court's attention, when the only circumstance indicating a potential conflict is joint representation, a trial court does not have a duty to inquire further:
 Holloway requires state trial courts to investigate timely objections to multiple representation. But nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case. Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. . . . Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate inquiry. *Page 8 
 Cuyler v. Sullivan, 446 U.S. 335, 346-47 (1980).
 {¶ 14} The Ohio Supreme Court followed Holloway and Cuyler inState v. Manross, 40 Ohio St. 3d 180 (1988). The defendants in that case were a mother and son. The son was indicted on nine counts of drug trafficking, one of which was dismissed before trial, and the mother was indicted on one count of aiding and abetting. They were both represented by the same lawyer and were jointly tried to a jury. The son was convicted on the eight counts that remained pending against him, and the mother was convicted on the count against her. On appeal, they argued that they had been denied effective assistance of counsel by their joint representation. The court of appeals reversed the defendants' convictions and certified a conflict to the Ohio Supreme Court.
 {¶ 15} The Ohio Supreme Court recognized that joint representation, without more, imposed no duty of inquiry on the trial court:
 Unless the trial court knows or reasonably should know that a particular conflict exists or unless the defendant objects to multiple representation, the court need not initiate an inquiry into the propriety of such representation. . . . It is not constitutionally mandated that a trial court inquire of co-defendants whether they wish to have separate counsel. . . . A trial court is not obligated to make an inquiry as a matter of course. An attorney representing multiple defendants in criminal proceedings is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of the trial. . . . In the absence of special circumstances, it seems reasonable for the trial court to assume that multiple representation entails no conflict or that the lawyer and his clients knowingly accepted such risk of conflict as may be inherent in such a representation. *Page 9 
Manross, 40 Ohio St. 3d at 181-82 (citations omitted). In State v.Ingol, 89 Ohio App. 3d 45 (1993), this Court, in reliance onCuyler, 446 U.S. 335, and Manross, reached the same conclusion.
 {¶ 16} Mr. Terry has pointed out that Rule 44 of the Federal Rules of Criminal Procedure imposes obligations on federal trial courts to "promptly inquire about the propriety of joint representation and . . . personally advise each defendant of the right to the effective assistance of counsel, including separate representation" in all cases in which defendants are jointly represented. The rule further provides that the court must take "appropriate measures to protect each defendant's right to counsel," unless "there is good cause to believe that no conflict of interest is likely to arise." The steps taken by the trial court in this case would not have been sufficient to satisfy Rule 44, if that rule had been applicable to this proceeding. That rule, however, imposes obligations greater than are imposed by the United States Constitution, and there are no similar obligations imposed by the Ohio Rules of Criminal Procedure. Manross, 40 Ohio St. 3d at 182. By failing to follow the procedures outlined in Rule 44 of the Federal Rules of Criminal Procedure, therefore, the trial court did not deny Mr. Terry any right to which he was entitled. As noted by the Ohio Supreme Court in Manross and by this Court in Ingol, however, the better practice is to follow a procedure like that set forth in Rule 44 of the Federal Rules of Criminal Procedure in all cases of joint representation. Id.; Ingol, 89 Ohio App. 3d at 49. *Page 10 
 {¶ 17} In this case, at the time the prosecutor brought the defendants' joint representation to the trial court's attention, that joint representation was the only thing that suggested a potential conflict of interest. Accordingly, the trial court did not err by failing to further inquire of defendants and their lawyers regarding that potential conflict.
 {¶ 18} The conclusion that the trial court did not err by failing to conduct a hearing does not end this Court's inquiry. Mr. Terry still may be entitled to relief if he has demonstrated on appeal that an actual conflict of interest adversely affected his lawyer's performance.Manross, 40 Ohio St. 3d at 182. Of course, in a situation in which no hearing was held or required in the trial court on the possible conflict, a defendant seeking relief on direct appeal is limited to demonstrating an actual conflict apparent from the record of what did occur in the trial court. See Knapp v. Edwards Laboratories,61 Ohio St. 2d 197, 199 (1980) ("[A]n appellant bears the burden of showing error by reference to matters in the record.").
 {¶ 19} Mr. Terry has argued that two things demonstrate that an actual conflict affected his lawyer's performance in this case. First, he has pointed out that his ability to take a lie detector test to possibly clear himself of the charges against him was contingent upon Mr. Sims pleading guilty. Second, he has pointed out that the existence of a telephone call from Ms. Williams's apartment at 10:30 p.m. on the night of the robbery to the telephone number of a friend of Mr. *Page 11 
Sims required him, in his testimony, to explain that telephone call by testifying that Mr. Sims had left the Simses' apartment that night for "a minute or two."
 {¶ 20} It is unclear how the prosecutor's offer regarding the lie detector test demonstrates that an actual conflict of interest affected Mr. Terry's lawyer's performance. If anything, the dual representation could have rendered Mr. Terry's lawyer more effective on his behalf. If Mr. Terry and his lawyer believed that it would have been to Mr. Terry's advantage to take the lie detector test, the dual representation could have placed Mr. Terry's lawyer in a position to apply pressure on Mr. Sims to plead guilty so Mr. Terry could take the test. Of course, there is nothing in the record to indicate that any such pressure was applied to Mr. Sims and, since he did not plead guilty, any possible pressure applied to him was ineffective. Certainly, neither Mr. Terry nor his lawyer would have been in a better position to apply pressure on Mr. Sims in the absence of the joint representation. The fact that the prosecutor offered that Mr. Terry could take a lie detector test if Mr. Sims pleaded guilty does not demonstrate that Mr. Terry was denied effective assistance of counsel as a result of the joint representation.
 {¶ 21} The same is true in regard to the telephone call placed from Ms. Williams's apartment. The situation regarding the telephone call is similar to a situation that was before the Ohio Supreme Court inState v. Gillard, 78 Ohio St. 3d 548 (1997) (Gillard III). On a previous appeal in that case, the Ohio Supreme Court had remanded to the trial court to determine whether the defendant had been *Page 12 
denied effective assistance of counsel by a conflict of interest because the defendant and his brother had been represented by the same lawyer. Both the defendant and his brother had been charged with two counts of murder and one count of attempted murder. The charges against the brother, however, had been dismissed following a preliminary hearing, and he, in accordance with advice from the lawyer who represented both the defendant and the brother, pleaded no contest to a misdemeanor charge of illegally discharging a firearm at the crime scene immediately prior to the murders. State v. Gillard, 64 Ohio St. 3d 304,306 (1992) (Gillard II). The defendant proceeded to trial before a jury on the charges against him.
 {¶ 22} At trial, the defendant called his brother as a witness. The prosecutor then informed the trial court of the defendant and his brother's joint representation and suggested that that joint representation presented a possible conflict of interest. The trial court appointed separate counsel for the brother, but failed to explore whether the possible conflict had or would affect the defendant's representation. The brother waived his right to self incrimination and proceeded to testify. On direct examination, he testified that the charges against him had been dismissed while those against the defendant had not been. He denied any involvement in the shootings and provided an explanation of all the evidence implicating him in the crimes. On cross examination, the prosecutor elicited the fact that the brother had pleaded no contest to discharging a firearm, which, in *Page 13 
effect, placed him at the scene of the crime just prior to the murders. Gillard II, 64 Ohio St. 3d at 308.
 {¶ 23} The Ohio Supreme Court had determined in Gillard II that the trial court knew or reasonably should have known that a possible conflict of interest existed that could affect the lawyer's representation of the defendant and, therefore, should have conducted an inquiry to determine whether the defendant "had received, and would receive, the right to conflict-free counsel guaranteed him by theSixth Amendment to the United States Constitution." Gillard II,64 Ohio St. 3d at 312. The Ohio Supreme Court remanded to the trial court for it to conduct a hearing to determine whether an actual conflict of interest had affected the lawyer's representation of the defendant.
 {¶ 24} On remand, the trial court conducted a hearing and determined no actual conflict had infringed on defendant's rights, and the case returned to the Ohio Supreme Court. Gillard III, 78 Ohio St. 3d at 548. In the Ohio Supreme Court, the defendant argued that the trial court had incorrectly determined that he had not been denied effective assistance of counsel.
 {¶ 25} The Supreme Court began its analysis of the defendant's argument by contrasting a "possible" conflict with an "actual" conflict:
 A possible conflict of interest exists where the "`interests of the defendants may diverge at some point so as to place the attorney under inconsistent duties.'" . . . It follows, then, that an actual conflict of interest exists if, "`during the course of the representation, *Page 14 
the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action.'" . . . Indeed, we have said that a lawyer represents conflicting interests "when, on behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose."
Id. at 552-553 (internal citations omitted) (emphasis in original). The defendant argued that his lawyer's conflicting loyalties had prevented him from suggesting that the defendant's brother had actually committed the crimes. The court explained that, to demonstrate an actual conflict based upon something an attorney failed to do, a defendant would first have to demonstrate that "some plausible alternative defense strategy or tactic might have been pursued" and second establish that the alternative strategy "was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." Id. at 553 (quotingUnited States v. Fahey, 769 F.2d 829, 836 (1st Cir. 1985).
 {¶ 26} The defendant in Gillard III had presented an alibi defense at trial, but argued that his lawyer should have not only presented his alibi defense, but also should have argued that his brother was the actual perpetrator of the crimes. The Supreme Court, however, concluded that the strategy of blaming the defendant's brother was not a plausible defense because the brother's participation would not have precluded the defendant from also having participated, particularly in light of the fact that the surviving victim had identified both the defendant and his brother as participants: *Page 15 
 We cannot say either that the alternative defense was viable or that [the lawyer's] failure to argue, on behalf of [the defendant], that [his brother] was the "real killer" was due to [the lawyer's] obligations to [the brother]. Although [the brother] may have been a plausible suspect, he was not an alternative suspect. Evidence of [the brother's] involvement was not inconsistent with [the defendant's] guilt, i.e., none of the evidence implicating [the brother] either negated [the defendant's] involvement or strengthened his alibi.
 Id. at 554 (emphasis in original). Accordingly, the court concluded that the defendant had failed to demonstrate that his lawyer had an actual conflict of interest that deprived the defendant of his right to effective assistance of counsel.
 {¶ 27} Presumably, by pointing out that he had to explain the telephone call placed from Ms. Williams's apartment during his testimony, Mr. Terry is suggesting that, in the absence of the joint representation, his lawyer would have been free to defend him by blaming Mr. Sims for the crimes. Both defendants, however, presented the same alibi defense, and Ms. Williams identified both as perpetrators. As it was, they both jointly attacked her credibility. For Mr. Terry's lawyer to have blamed Mr. Sims for the crimes, either as a lone perpetrator or acting with a different accomplice, would have lent credibility to her identification of Mr. Sims at the same time he was attempting to impeach her identification of Mr. Terry. As was true in Gillard III, while Mr. Sims was a plausible suspect, he was not an "alternative" suspect. This Court concludes, as did the Ohio Supreme Court in Gillard III, that the suggested defense was not a viable defense. Mr. Terry's lawyer's failure to blame Mr. Sims for the crimes was not because of a conflict resulting from the joint representation. The record in this *Page 16 
case does not demonstrate that Mr. Terry was denied effective assistance of counsel by an actual conflict of interest.
 IV. {¶ 28} Mr. Terry's assignment of error is overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
 Costs taxed to appellant. *Page 17 
 WHITMORE, P. J., MOORE, J. CONCUR *Page 1